L&B CORPORATION, A NEBRASKA CORPORATION, ET AL.[1]
PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket Nos. 32911-84, 32935-84,     Filed April 6, 1987.
33261-84.

*Truman Claire, Steven M. Watson, Paul A. Rauth,* and
*Jackie L. Vencil,* for the petitioners.
*Robert L. Archambault,* for the respondent.

COHEN, *Judge*: Respondent determined the following
deficiencies in petitioners' Federal income taxes and
claimed, by amendments to answer, the following increased
deficiencies in petitioners' Federal income taxes:

---

[1]Cases of the following petitioners are consolidated herewith: Larry A. Larsen and Betty J.
Larsen, docket No. 32935-84; and Estate of Howard C. Larsen, Deceased, Maxine J. Larsen,
Executrix and Maxine J. Larsen, docket No. 33261-84.

| Petitioner | Year | Deficiency | Increased deficiency |
|---|---|---|---|
| L&B Corp. | 2/28/75 | $10,353.89 | |
| | 2/29/76 | 307.58 | |
| | 2/28/79 | 18,991.04 | |
| | 2/29/80 | 19,590.06 | |
| | 2/28/81 | 17,249.75 | $3,325.91 |
| Larry A. Larsen and | 1976 | 9,301.73 | |
| Betty J. Larsen | 1977 | 22,770.73 | |
| | 1978 | 13,916.15 | |
| | 1979 | 27,177.68 | |
| | 1980 | 20,708.32 | 4,096.49 |
| Estate of Howard C. | 1976 | 6,803.23 | |
| Larsen, deceased, and | 1977 | 1,903.85 | |
| Maxine J. Larsen | 1978 | 11,843.21 | |
| | 1979 | 29,627.03 | 1,683.14 |
| | 1980 | 28,418.35 | |

Petitioners were partners in certain partnerships. After concessions, the issues for decision are (1) whether petitioners are entitled to investment tax credits under section 38[2] with respect to certain refrigerated structures, truck turn-arounds, and railroad tracks placed in service by the partnerships in 1979 and 1980 to an extent greater than allowed by respondent; (2) whether the partnerships are entitled to depreciation deductions with respect to the refrigerated structures and truck turn-arounds using the 200-percent-declining-balance method of depreciation under section 167(b)(2); and (3) whether the partnerships are entitled to depreciation deductions with respect to the refrigerated structures and railroad tracks based on useful lives of 15 years or 33⅓ years.

## FINDINGS OF FACT

Some of the facts have been stipulated. The facts set forth in the stipulations are incorporated in our findings by this reference.

Petitioner L&B Corp., a Nebraska corporation, had its principal place of business in Omaha, Nebraska, when its petition was filed. The corporation filed 1974 through 1980 corporate income tax returns with the Internal Revenue Service Center in Ogden, Utah, for its fiscal years ended

[2]Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

February 28, 1975, through February 28, 1981, respectively. Petitioners Larry A. Larsen and Betty J. Larsen, husband and wife, resided in Omaha, Nebraska, when they filed their petition. They filed joint Federal income tax returns for 1976 through 1980 and an amended return for 1978 with the Internal Revenue Service Center in Ogden, Utah. Howard C. Larsen died on June 7, 1982, and his surviving spouse, Maxine J. Larsen, is the duly appointed executrix of his estate. Petitioner Maxine J. Larsen resided in Omaha, Nebraska, when she filed the petition on behalf of her husband's estate and herself. They filed joint Federal income tax returns for 1976 through 1980. They had two children, Lance Sterling Larsen and Ashley Larsen.

Petitioners were partners in Larsen Realty, Millard Warehouse - Des Moines (Millard-DM), and Millard Warehouse - Denison (Millard-D) (collectively, the partnerships), partnerships with principal offices located in Omaha, Nebraska. The partnerships filed information returns with the Internal Revenue Service Center in Ogden, Utah, as follows: Larsen Realty for calendar years 1979 and 1980, Millard-DM for calendar years 1979 and 1980, and Millard-D for calendar year 1980.

By partnership agreements, the following partners, including petitioners, were entitled to distributive shares of income, gain, loss, deductions, and credits of said partnerships in the percentages and for the years indicated:

| Partners | Larsen Realty (1979-80) | Millard Warehouse— Des Moines (1979-80) | Millard Warehouse— Denison (1980 only) |
|---|---|---|---|
| L&B Corp. | | 50% | |
| Larry A. Larsen | 50% | 25 | 60% |
| Howard and Maxine Larsen | 50 | | |
| Howard Larsen | | 25 | |
| Lance Sterling Larsen | | | 20 |
| Ashley Larsen | 20 | | |
| | 100 | 100 | 100 |

## Description of the Facilities

Larsen Realty operated its business in facilities located in Omaha, Nebraska (LR-Omaha), and Lincoln, Nebraska (LR-Lincoln). LR-Omaha commenced operations in about 1961,

at which time its first cold storage facility was built. On or about August 1, 1979, Larsen Realty placed in service the following additions to LR-Omaha: a refrigerated structure, a loading dock area, and a paved truck turn-around area.

The refrigerated structure, as described below, was designed and constructed in such a manner as to provide for the cold storage of certain meats and other products. Thus, the structure includes certain insulation and other special features to maintain cold temperatures inside the structure and to prevent the penetration of moisture into the facility.

The refrigerated structure is rectangular in shape, approximately 160 feet by 130 feet, and stands approximately 25 feet high. The structure rests on a foundation of poured concrete footings, under each wall and the dock partition, and concrete block footings, under certain walls. The structure and the pre-existing facility share a common wall, an insulated metal panel wall. The floor of the structure is a 6-inch poured concrete level slab. Beneath the concrete floor is a 6-inch layer of polystyrene insulation. Beneath the insulation and extending under the added loading dock area is a layer of gravel. Approximately 40 rows of 4-inch clay pipe run north to south within the gravel layer under the floor of the cold storage facility and dock area. Waste heat from refrigerator compressors is pumped through the clay tiles to the outside to keep the ground below the floor from freezing which, if it did, would cause the floor of the structure to buckle or heave. Prior to construction, the soil was tested to determine if the water table was sufficiently low so that unnecessary moisture would not be drawn up to the floor of the structure.

Steel wall panels and concrete blocks form the walls of the structure. The panels, approximately 25 feet high and 5 feet wide, are connected by tongue and groove. The panels are 5 inches thick and are constructed of a corrugated metal outer face and a smooth metal inner face which sandwich about 5 inches of polyurethane insulation. The panels are placed and sealed in a track that is glued to the footings around the perimeter of the storage facility. The insides of the panels are bolted to the steel framing, and the tops of the panels are sealed in a track. A concrete bumper, which was poured against the panels on the inside of the exterior

walls and anchored to the floor slab, prevents forklifts from backing up into the wall.

The roof of the structure is relatively flat, sloping ⅛ inch per foot. It is supported by steel roof joists that are welded to outside wall beams and certain interior beams. A 1½ inch thick, 22-gauge corrugated steel decking is situated on the roof joists. Nine inch insulation boards lie over the steel decking above the cold storage area, and 4½-inch insulation boards lie over the decking above the added dock area. A single-ply membrane roof cover lies over the insulation.

The equipment attached to the interior of the structure consists of storage racks, refrigeration coils and blowers (chiller units), and piping from the pre-existing refrigeration compressor room. The storage racks are bolted to the concrete slab floor. The two chiller units are attached above the storage racks close to the west wall and supported from the ceiling and structural I-beams.

The costs of the additions to LR-Omaha were as follows:

| Building | | Cost |
|---|---|---|
| Dock area | | $39,484.97 |
| *Freezer area* | | |
| Structure | $337,307.65 | |
| Refrigeration equipment | 42,834.81 | 380,142.46 |
| *Non-refrigeration equipment* | | |
| Storage racks | 53,068.07 | |
| Fork lifts | 19,242.54 | |
| Dock levelers | 3,969.46 | |
| Other | 437.22 | 76,717.29 |
| *Truck turn-around area* | | 17,673.30 |
| Total cost | | 514,018.02 |

In 1979, Larsen Realty also made certain improvements to LR-Lincoln. The costs of the additions were as follows:

| Property | Cost |
|---|---|
| Addition improvements | $78,551.45 |
| Non-refrigeration equipment | 18,863.61 |
| Truck turn-around | 14,490.84 |
| | 111,905.90 |

Millard-DM operated its business in facilities located in Des Moines, Iowa. On December 1, 1979, Millard-DM placed in service its main cold storage facility, or refrigerated structure. An addition to this facility was placed in service on March 1, 1980. On or about September 1, 1980, a

railroad spur leading up to the addition was placed in service. The main refrigerated structure and its addition were designed and constructed, in a manner similar to the LR-Omaha facility, to provide for the cold storage of meats and other products.

The main facility is approximately 289 feet by 194 feet and is approximately 25 feet tall. It includes several truck docks, general offices, a mezzanine, a cooler storage area, and a freezer storage area. The cooler storage area is divided by interior walls into four coolers, of which two measure 64 feet by 64 feet and the other two measure 64 feet by 32 feet. The freezer storage area, which is adjacent to the cooler area, is approximately 160 feet by 191 feet and includes two 32-foot by 25-foot areas, with movable wood partitions, that are called blast cells or blast freezers.

The addition placed in service in 1980 is located immediately west of the main facility and includes a railroad dock, a compressor or engine room, and a refrigerated structure. The compressor room services both the main and additional facilities. The cold storage area of the addition is 64 feet by 160 feet and is approximately 25 feet high. It includes a 25-foot by 30-foot blast freezer area segmented off by movable wood partitions and a 25-foot by 25-foot area segmented off by wire mesh and referred to on blueprints as the "cage," which allows for the isolation of certain meats when so required by the U.S. Department of Agriculture (USDA). Equipment attached to the interior of the main facility and the addition includes storage racks, refrigeration coils and blowers, and piping from the compressor room. The equipment is attached in a manner similar to the equipment in the LR-Omaha addition.

The costs incurred with regard to the main facility placed in service on or about December 1, 1979, were as follows:

| *Building* | | *Cost* |
|---|---|---|
| Mezzanine, offices and dock areas | | $298,352.28 |
| *Freezer/cooler areas* | | |
| Structure | $913,237.86 | |
| Refrigeration equipment | 153,455.43 | 1,066,693.29 |
| *Land improvements* | | |
| Truck turn-around area | 116,231.68 | |

| _Land improvements_ | | _Cost_ |
|---|---|---|
| Customer and employee parking and landscaping................... | $74,565.47 | $190,797.15 |
| _Non-refrigeration equipment_ | | |
| Dock levelers ......................... | 10,979.10 | |
| Other .............................. | 198,648.48 | 209,627.58 |
| _Furniture and fixtures_ ................................. | | 3,284.45 |
| Total cost..................................... | | 1,768,754.75 |

The costs of the addition placed in service on or about March 1, 1980, were as follows:

| _Building_ | | _Cost_ |
|---|---|---|
| Lessee alterations..................... | $22,493.39 | |
| New docks.......................... | 45,411.44 | $67,904.83 |
| _Freezer/cooler areas_ | | |
| Structure........................... | 198,505.89 | |
| Refrigeration equipment............... | 53,347.52 | 251,853.41 |
| _Railroad trackage_..................................... | | 65,023.12 |
| _Land improvements_ | | |
| Landscaping........................................ | | 1,195.32 |
| _Non-refrigeration equipment_ | | |
| Sinks and lavatories.................. | 2,728.00 | |
| Other .............................. | 198,288.94 | 201,016.94 |
| _Furniture and fixtures_ ................... | | |
| Artwork............................ | 478.65 | |
| Other .............................. | 3,241.30 | 3,719.95 |
| Total cost..................................... | | 590,713.57 |

On November 1, 1980, Millard-D placed in service a refrigerated structure in Denison, Iowa, including a truck turn-around and railroad spur to the facility. The design and construction of the facility, to provide for the cold storage of meats and other products, were similar to the other refrigerated structures described above. The facility is rectangular in shape, 227 feet by 194 feet, and 25 feet in height. It includes truck and railroad docks, a mezzanine area with offices, a compressor room, a pork processing room including a meat inspection room for Federal inspectors, and a cold storage area. The cold storage area of the facility is 192 feet by 192 feet, including an engine room of 32 feet by 32 feet. The cold storage facility contains two cooler rooms, 64 feet by 96 feet each, and three blast freezers, 30 feet by 32 feet each.

The costs of the Millard-D facility were as follows:

| Building | | Cost |
|---|---|---|
| Mezzanine, offices, and dock areas .................... | | $157,097.99 |
| *Freezer/cooler areas* | | |
| Structure............................ | $798,649.64 | |
| Refrigeration equipment............... | 118,627.27 | 917,276.91 |
| *Land improvements* | | |
| Truck turn-around area................ | 23,839.21 | |
| Customer and employee parking ....... | 4,767.84 | 28,607.05 |
| *Railroad trackage*........................................ | | 57,011.82 |
| *Non-refrigeration equipment* | | |
| Dock levelers ......................... | 3,397.57 | |
| Telephone-pager system ............... | 4,571.25 | |
| Other ................................ | 239,480.74 | 247,449.56 |
| *Office equipment* | | |
| Art work ............................. | 873.00 | |
| Other ................................ | 5,455.40 | 6,328.40 |
| *Transportation equipment—auto*.......................... | | 2,800.00 |
| Total cost.................................... | | 1,416,571.73 |

Storage racks in the LR-Omaha, Millard-DM, and Millard-D cold storage facilities were designed to facilitate the circulation of air over and around the meat and other products. Although the storage racks could be removed without damage to the structures, holes in the floors of the structures where the storage racks are bolted would have to be plugged if the racks were removed. The facilities included special lighting systems adaptable to extremely low temperatures and elaborate sprinkler systems, designed so that water would not freeze in the pipes. The refrigeration equipment within each of the storage facilities, including the refrigeration coils and blowers or chiller units, could be removed from the facilities without damage to the structures. Where such equipment is installed on the roof, removal would leave screw holes.

## Operation of the Facilities

The partnerships prepared a "Cold Storage TARIFF," or schedule of rates and charges, for 1979 and 1980. These documents included information regarding operating hours, plant addresses, and effective dates. Contract terms and conditions for storage were described, including the following: (1) Tender For Storage - all goods shall be delivered properly marked and packed for handling; (2) Storage Period

- goods are generally stored on a month-to-month basis; (3) Storage Rates and Insurance; (4) Handling Charges; (5) Delivery Requirements; (6) Liability; (7) Liens and Security Interests; and (8) Controlling Law. The schedules described the partnerships' handling rates and storage rates for the following products:

| *Coolers* | *Freezer* |
|---|---|
| 1. Cheese | 1. Candy |
| 2. Butter and butter substitutes | 2. Eggs - canned and dried |
| 3. Candy | 3. Fish and seafoods |
| 4. Dried fruit | 4. Fruit |
| 5. Shelled and unshelled nuts | 5. Vegetables |
| 6. Eggs - shelled and dried | 6. Juices |
| 7. Fruit juices | 7. Soups |
| 8. Horticultural goods | 8. Prepared and cooked foods |
| 9. Lard |    a. Cakes |
| 10. Meat - canned and smoked |    b. Meat cuts |
| 11. Milk and cream (powdered) |    c. Pastries |
| 12. Potatoes |    d. Pies |
| |    e. Rolls |
| |    f. Waffles |
| |    g. Ice cream |
| |    h. Convenience foods |
| |    i. Toppings |
| | 9. Meats |
| |    a. Loose hams |
| |    b. Cuts |
| |    c. Pork bellies |
| |    d. Carcasses |
| | 10. Potatoes - french fries |
| | 11. Poultry |
| | 12. Turkeys |

Additional charges were described for, among other things, collection, distribution, extra labor, freezing, exports, inspection, and sorting.

Most of the space in the facilities was operated on a public storage basis. During 1979 and 1980, the partnerships handled as much as 20 million pounds of meat per week. Customers of the partnerships were primarily packers such as Swift, Dupaco, Iowa Beef Packers, and Farmland Foods, which used the storage facilities in 1979 and 1980 to build inventories of certain products with seasonal demand, such as canned hams for Christmas, corned beef for St. Patrick's Day, and pork bellies for bacon having a high

demand in summer months. Nearly all products received at the partnerships' storage facilities in 1979 and 1980 were boxed or packaged with labels or brand names of the processor printed or attached to the box. Such products, when received, were unloaded at the rail and truck docks by employees and placed on pallets. They were inventoried and assigned lot numbers and placed by forklift in numbered storage racks. Inventory cards were maintained for all shipments, and the inventory was generally handled on a first-in first-out (FIFO) basis. The packers normally retained title to the foods stored until they were sold and shipped out, except for the pork bellies, which were often traded as commodities on the exchange. Overall employee activity was minimal and consisted essentially of unloading, storing, and loading products.

The facilities served two functions. First, meat that was "hot," i.e., freshly cut, was frozen. It generally took 1 or 2 days, at most, to freeze meat, depending on whether the freezer or sharp freezer area was used. Second, meat and other products were stored at cold to extremely cold temperatures. Although the facilities sometimes turned over a complete inventory in a couple of weeks, many products remained in storage for months. The refrigeration equipment in each of the refrigerated structures was two-tiered, i.e., the equipment could provide for either cooler or freezer services. The cooler or cold storage areas were maintained at temperatures of approximately 32 degrees. The freezer areas were maintained at about minus 10 degrees to minus 20 degrees. Some of the freezer areas included small sharp freezer areas designed for rapid freezing at minus 30 degrees to minus 40 degrees using high wind velocity.

The rail facilities at Millard-D and Millard-DM accommodated the partnerships' export business. The railroad tracks at Millard-DM were used for both in-shipments and out-shipments, but the railroad tracks at Millard-D were used almost exclusively for out-shipments.

### Notices of Deficiency

In their returns for 1979 and 1980, petitioners claimed investment tax credits for certain of the partnerships' improvements and additions. Among the items claimed were

(1) the cold storage facilities, which included the refrigerated structures, the refrigeration equipment, and other equipment and improvements; (2) the truck turn-around areas; and (3) the railroad trackage. The partnerships claimed depreciation expense deductions for the refrigerated structures, railroad tracks, and truck turn-arounds using the 200-percent-declining-balance method and useful lives of 15 years.

In his notices of deficiency, respondent allowed investment tax credits for the refrigeration equipment and the railroad trackage but disallowed credits for the refrigerated structures and the truck turn-arounds. In amendments to answers, respondent asserts that the railroad trackage is not eligible for investment tax credit. Respondent also determined in his notices of deficiency that the partnerships must use (1) the 150-percent-declining-balance method for computing the allowances for depreciation of the refrigerated structures and the truck turn-arounds, and (2) useful lives of 33⅓ years for computing the allowances for depreciation of the refrigerated structures and the railroad trackage.

The deficiencies determined in docket No. 32911-84 for fiscal years ended February 28, 1975, February 29, 1976, and February 28, 1979; in docket No. 32935-84 for taxable years 1976, 1977, and 1978; and in docket No. 33261-84 for taxable years 1976, 1977, and 1978 are attributable to the disallowance of investment credit carrybacks with respect to properties each of the partnerships placed in service during 1979 and 1980.

## OPINION

### Investment Tax Credit Issue

The primary issue for consideration is whether petitioners are entitled to investment tax credits under section 38 with respect to certain refrigerated structures, paved truck turn-around areas, and railroad tracks, all of which were placed in service during the years in issue. Resolution of this issue depends on whether any or all of the property may be characterized as "section 38 property" that is eligible for credit against Federal income tax under section 38.

The term "section 38 property" is defined in section 48(a)(1), which provides, in relevant part, as follows:

(1) IN GENERAL.— * * * the term "section 38 property" means—
  (A) tangible personal property * * * , or
  (B) other tangible property (not including a building and its structural components) but only if such property—
    (i) is used as an integral part of manufacturing, production, or extraction, or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, or * * *

        *    *    *    *    *    *    *

    (iii) constitutes a facility used in connection with any of the activities referred to in clause (i) for the bulk storage of fungible commodities (including commodities in a liquid or gaseous state), * * *

        *    *    *    *    *    *    *

Such term includes only property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life (determined as of the time such property is placed in service) of 3 years or more. * * *

Petitioners contend that the properties in question qualify as "other tangible property" pursuant to section 48(a)(1)(B). Specifically, petitioners argue that the properties are not buildings but, instead, that the properties are used as an integral part of production or, alternatively, that the properties constitute facilities that provide bulk storage of fungible commodities. See sec. 48(a)(1)(B)(i) and (iii). Petitioners bear the burden of proving entitlement to the claimed investment tax credits. *Munford, Inc. v. Commissioner*, 87 T.C. 463, 488 (1986); Rule 142(a), Tax Court Rules of Practice and Procedure.

Because the statute specifically excludes buildings from investment tax credit and because such a determination would obviate the need for further inquiry, we shall first address whether the refrigerated structures constitute buildings.

*Building—Section 48(a)(1)(B)*

The term "building" is defined in section 1.48-1(e)(1), Income Tax Regs., as follows:

(e) *Definition of building and structural components.* (1) Buildings and structural components thereof do not qualify as section 38 property. The

term "building" generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof, the purpose of which is, for example, to provide shelter or housing, or to provide working, office, parking, display, or sales space. The term includes, for example, structures such as apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores. Such term includes any such structure constructed by, or for, a lessee even if such structure must be removed, or ownership of such structure reverts to the lessor, at the termination of the lease. Such term does not include (i) a structure which is essentially an item of machinery or equipment, or (ii) a structure which houses property used as an integral part of an activity specified in section 48(a)(1)(B)(i) if the use of the structure is so closely related to the use of such property that the structure clearly can be expected to be replaced when the property it initially houses is replaced. Factors which indicate that a structure is closely related to the use of the property it houses include the fact that the structure is specifically designed to provide for the stress and other demands of such property and the fact that the structure could not be economically used for other purposes. Thus, the term "building" does not include such structures as oil and gas storage tanks, grain storage bins, silos, fractionating towers, blast furnaces, basic oxygen furnaces, coke ovens, brick kilns, and coal tipples.

This regulation was issued pursuant to section 38(b), which authorized the Treasury to "prescribe such regulations as may be necessary to carry out the purposes" of the investment tax credit provisions. It conforms to congressional understanding of the term "building" as described in the legislative history. See H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 405, 516; S. Rept. 1811, 87th Cong., 2d Sess. (1962), 1962-3 C.B. 707, 858-859. It is thus a legislative regulation, almost as binding as the statute itself. *Yellow Freight System, Inc. v. United States*, 538 F.2d 790, 795-796 (8th Cir. 1976).

The regulation defines "building" in terms of two tests, or a two-part test. The appearance test generally requires a "structure or edifice enclosing a space within its walls, and usually covered by a roof," and the function test generally requires the structure "to provide shelter or housing, or to provide working, office, parking, display, or sales space," or to provide a similar function. Sec. 1.48-1(e)(1), Income Tax Regs.; *Munford, Inc. v. Commissioner*, 87 T.C. at 479.

Many courts, including this Court, emphasize the function of a structure to determine whether it is a building. See *Munford, Inc. v. Commissioner*, 87 T.C. at 479-480, and

cases cited therein. Other courts, including the Court of Appeals for the Eighth Circuit, to which an appeal in this case would lie, require that a structure satisfy both the appearance test and the function test to qualify as a building. *Yellow Freight System, Inc. v. United States*, 538 F.2d at 796-798; *Illinois Cereal Mills, Inc. v. Commissioner*, 789 F.2d 1234, 1238 (7th Cir. 1986); *A.C. Monk & Co. v. United States*, 686 F.2d 1058, 1061 (4th Cir. 1982).

In *Yellow Freight System*, the taxpayer sought investment tax credit for the cost of certain loading docks and inspection lanes. The issue was whether the property qualified as "other tangible property" under section 48(a)(1)(B). The District Court applied the function test and allowed the investment tax credit. It concluded that because of the specialized purpose of the property, i.e., that it facilitated the transfer of freight in the taxpayer's transportation business, the structures did not function as buildings under section 48(a)(1)(B). *Yellow Freight System, Inc. v. United States*, 413 F. Supp. 357, 367-368 (W.D. Mo. 1975). The Court of Appeals reversed, rejecting the District Court's application of the function test to the extent it ignored the appearance of the structure and to the extent it emphasized the nature of employee activity within the structure without consideration of the amount of human activity within the structure. 538 F.2d at 797. The court stated that the regulation and legislative history require consideration of both appearance and function, that the function test is no less "imprecise" than the appearance test, and that appearance and function are not mutually exclusive, i.e., "a given structure is designed to accommodate the functions for which it is to be used." 538 F.2d at 797-798.

In *Yellow Freight System*, the Court of Appeals applied both tests to the loading docks and inspection lanes and held that they each resembled buildings and functioned as buildings, thus denying investment tax credit to the taxpayer. Specifically, the court found that the property resembled buildings in that (1) they were permanent structures with substantial dimensions, and (2) they were not uniquely designed, or structurally different, from other buildings. (That neither the docks nor the inspection lanes

had clearly discernible walls was not regarded as controlling by the court because the definition in the regulation furnishes only a general description of buildings.) The court also found that the property functioned as buildings in that the property essentially provided shelter and work space for men and equipment. 538 F.2d at 796.

Petitioners argue that the elements persuading the court in *Yellow Freight System* that the properties therein were buildings are not present in this case, i.e., (1) the refrigerated structures here are uniquely designed and uniquely functional, (2) they do not provide shelter or working space, and (3) to convert the refrigerated structures to an alternative use would require major structural and building material changes as well as prohibitive costs. Petitioners contend that because of these factors the refrigerated structures are not buildings as that term is defined for purposes of section 48(a)(1)(B).

Applying the appearance test of the regulation as mandated by *Yellow Freight System*, and *Golsen v. Commissioner*, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), we conclude that the refrigerated structures in issue resemble buildings. We have examined photographs and blueprints of the structures and have considered the testimony of witnesses; the structures are permanent structures of substantial dimensions which enclose spaces surrounded by walls and covered by roofs. See sec. 1.48-1(e)(1), Income Tax Regs.; *Yellow Freight System, Inc. v. United States*, 538 F.2d at 796; *Munford, Inc. v. Commissioner*, 87 T.C. at 481.

Petitioners argue that the refrigerated structures do not appear as buildings because of their unique design. We agree that the structures were specially designed in order to meet their intended purpose, i.e., to freeze meats and other food products and to provide cold storage for them. These specialized or "unique" features, however, do not alter the building-like appearance of the structure. Although it might be possible for a structure to be so unique in its design that its appearance is not that of a building in the ordinary sense, such is not the case with the refrigerated structures in issue here.

We must next consider whether the refrigerated structures function as buildings. This Court recently applied the function test to determine whether refrigerated structures, similar to the ones in issue here, were buildings. *Munford, Inc. v. Commissioner*, 87 T.C. 463 (1986). Therein, we reiterated that the function test requires a determination of "whether the purpose of the structure at issue is a purpose ejusdem generis to the purposes described by example in section 1.48-1(e)(1), Income Tax Regs." 87 T.C. at 480, citing *Consolidated Freightways v. Commissioner*, 74 T.C. 768, 795 (1980), affd. on this issue 708 F.2d 1385 (9th Cir. 1983). We also stated:

In applying the functional test, a major focus of inquiry is whether the structure provides working space for employees which is more than merely incidental to the primary function of the structure. See, e.g., *Brown-Forman Distillers Corp. v. United States*, 205 Ct. Cl. [402] at 418, 499 F.2d [1263] at 1271 [Ct. Cl. 1974]; *Valmont Industries, Inc. v. Commissioner*, [73 T.C. 1059] *supra* at 1072 [1980]; *Scott Paper Co. v. Commissioner*, [74 T.C. 137] *supra* at 178 [1980]; *Catron v. Commissioner*, [50 T.C. 306] *supra* at 316 [1968]. In this regard, it is appropriate to consider both the quantity and quality of the human activity within the structure. See *Consolidated Freightways, Inc. v. United States*, 223 Ct. Cl. [443] at 461, 620 F.2d [862] at 873 [Ct. Cl. 1980]; *Consolidated Freightways v. Commissioner*, 74 T.C. at 795; *Satrum v. Commissioner*, [62 T.C. 413] *supra* at 417 [1974]. * * * [*Munford, Inc. v. Commissioner*, 87 T.C. at 480.]

Applying the function test to the refrigerated structure in *Munford*, we concluded that the structure was not a building:

We think that the principal purpose or function of the refrigerated area is not to furnish working space for petitioner's employees, but rather, to provide an area in which frozen foods may be stored at low temperature. In contrast with the truck and rail loading platforms [also at issue in *Munford*], the refrigerated area of the Addition is maintained at a temperature which limits, rather than promotes, human activity. Due to the cold temperature, the activities of petitioner's employees are limited in both scope and duration. In the case of the Addition's refrigerated area, the structure itself serves the principal function of low temperature storage of products, and the activities of petitioner's employees are merely supportive of and ancillary to this function. Accordingly, we conclude that the refrigerated portion of the Addition is not a building under the functional test. [87 T.C. at 483.]

Petitioners argue that the facts in this case are virtually indistinguishable from those in *Munford* and that we should likewise conclude that the structures do not function as buildings. Respondent argues that *Munford* is inapplicable because, among other things, we there considered whether property was eligible for investment tax credit under section 48(a)(1)(A). Indeed, the analysis in this case clearly falls under section 48(a)(1)(B); however, the regulations and the applicable cases make no distinction in the definition of "building" for purposes of subparagraph (A) or subparagraph (B) of section 48(a)(1). See *Munford, Inc. v. Commissioner*, 87 T.C. at 478 n. 9. We agree with petitioners that the facts are similar and that, in this case, the refrigerated structures do not function as buildings. Although "hot" or fresh meat was sometimes delivered to the facilities to be frozen and then stored, unlike the facts in *Munford* where the foodstuff was already frozen, the evidence does not indicate that significant human activity, of quantity or quality, took place in the refrigerated structures. The structures did not function as working space for employees and equipment; rather, the refrigerated structures functioned to freeze meat and provide low temperature storage space for the meat and other food products.

Our conclusion is consistent with the application of the function test in *Yellow Freight System, Inc. v. United States*, 538 F.2d 790 (8th Cir. 1976). In that case, the Court of Appeals for the Eighth Circuit found that the structures in issue, loading docks and inspection lanes, did not serve the purpose of expediting the transfer of freight but merely provided working space for the employees and equipment performing that function. 538 F.2d at 796. In this case, however, the refrigerated structures performed the function identified, not the employees.

Respondent argues that because we ultimately determined that the structure in *Munford* was "inherently permanent" and thus ineligible for investment tax credit under section 48(a)(1)(A) and section 1.48-1(c), Income Tax Regs., our determination therein that the structures were not buildings, i.e., did not function as buildings, is dictum and therefore not binding in this case. We disagree. Our

resolution of the building issue in *Munford* was hardly a mere observation or remark of little bearing on the ultimate decision. Rather, the building issue was, because of the language of the statute and regulations there in issue, properly a threshold question for consideration. The same is true in this case, although we are applying a different subparagraph of section 48(a)(1).

We have thus concluded that the refrigerated structures resemble buildings and function *not* as buildings. Because we understand the Court of Appeals for the Eighth Circuit to require that a structure appear *and* function as a building to be deemed a building under section 48(a)(1)(B),[3] we hold that the refrigerated structures are not buildings.[4]

Having concluded that the refrigerated structures are not buildings, we must now determine whether the refrigerated structures, the truck turn-arounds, and the railroad tracks otherwise qualify for investment tax credit under either section 48(a)(1)(B)(i) or section 48(a)(1)(B)(iii).

## Integral Part of Production—Section 48(a)(1)(B)(i)

Petitioners maintain that the refrigerated structures, paved truck turn-arounds, and railroad tracks qualify for

---

[3]See *Stuppy, Inc. v. United States*, 454 F. Supp. 1378, 1385 (W.D. Mo. 1978) (greenhouses are not buildings under either the appearance or function test); *Starr Farms, Inc. v. United States*, 447 F. Supp. 580 (W.D. Ark. 1977) (chicken houses appear and function as buildings in Eighth Circuit despite cases in other circuits and Tax Court holding otherwise). See generally *Valmont Industries, Inc. v. Commissioner*, 73 T.C. 1059 (1980).

[4]In addition to identifying an appearance test and function test for determining if a structure is a building, sec. 1.48-1(e)(1), Income Tax Regs., allows for two exceptions from the general definition of a building. The exceptions include (1) structures that are essentially machinery or equipment, or (2) certain structures that house property used in a qualifying activity under sec. 48(a)(1)(B)(i) if the structure and housed property are so closely related that they can be expected to be replaced together. Petitioners argue that their refrigerated structures fall with the first exception because they are essentially large refrigerator-freezers. Petitioners rely on Rev. Rul. 71-489, 1971-2 C.B. 64. Respondent argues that petitioners' structures do not refrigerate as machines or equipment but merely facilitate the operation of refrigeration equipment for which investment tax credits were allowed. Although petitioners do not affirmatively assert application of the second exception, respondent further argues that the property fails the second exception because it was reasonably adaptable to other commercial uses. Petitioners contend that any conversion to other uses would be unreasonable and uneconomical. Cf. *Munford, Inc. v. Commissioner*, 87 T.C. at 487-488. We have previously noted the confusion surrounding the application of the alternative use test. See *Munford, Inc. v. Commissioner*, 87 T.C. 463, 486-487 (1986), where we noted that reasonable adaptability has been considered for purposes of determining whether a structure is (1) a qualifying storage facility under sec. 48(a)(1)(B)(iii), (2) a structure housing qualifying property under sec. 1.48-1(e)(1)(ii), Income Tax Regs., and (3) a qualifying single purpose agriculture or horticulture structure under sec. 48(a)(1)(D). Because of the parties' exhaustive argumentation respecting these exceptions, we describe their positions thereon. Our conclusion that the structures are not buildings, however, precludes any need to address these arguments.

investment tax credit because they were used as an integral part of production within the meaning of section 48(a)(1)(B)(i). The regulations define "production" as follows:

(2) *Manufacturing, production, and extraction.* For purposes of the credit allowed by section 38, the terms "manufacturing", "production", and "extraction" include the construction, reconstruction, or making of property out of scrap, salvage, or junk material, as well as from new or raw material, by processing, manipulating, refining, or changing the form of an article, or by combining or assembling two or more articles, and include the cultivation of the soil, the raising of livestock, and the mining of minerals. Thus, section 38 property would include, for example, property used as an integral part of the extracting, processing, or refining of metallic and nonmetallic minerals, including oil, gas, rock, marble, or slate; the construction of roads, bridges, or housing; *the processing of meat*, fish, or other foodstuffs; the cultivation of orchards, gardens, or nurseries; the operation of sawmills, the production of lumber, lumber products or other building materials; the fabrication or treatment of textiles, paper, leather goods, or glass; and the rebuilding, as distinguished from the mere repairing, of machinery. [Sec. 1.48-1(d)(2), Income Tax Regs. Emphasis supplied.]

Petitioners argue that the property in issue was used as an integral part of the processing of meat. Petitioners thus contend that the freezing and ultimate storage of meat is a process, i.e., a qualifying activity. Petitioners rely on certain cases, including *Giannini Packing Corp. v. Commissioner*, 83 T.C. 526 (1984), and *Central Citrus Co. v. Commissioner*, 58 T.C. 365 (1972), for the proposition that the controlling of atmospheric conditions is essential to the production of agricultural products and the preparation of such products for shipment.

If we determine that the refrigerated structures were used as an integral part of processing and were therefore eligible for investment tax credit, respondent concedes the investment tax credits for all the truck turn-arounds and for the Millard-DM railroad tracks. Respondent does not, in like manner, concede the investment tax credit for the Millard-D railroad tracks because he contends that the evidence shows that the Millard-D tracks were used only for out-shipments of food, not both in- and out-shipments like the tracks at Millard-DM. See sec. 1.48-1(d)(4), Income Tax Regs. Respondent argues, nevertheless, that neither the freezing nor storage of meat is a process as that term is defined for purposes of section 48(a)(1)(B)(i). Instead, respondent con-

tends that the freezing and cold storage of meat is simply a "marketing process" (as compared to a qualifying manufac-turing or production process) that merely extends the shelf life of the product.

In *Giannini Packing Corp. v. Commissioner, supra,* we allowed investment tax credits, holding that rooms in the taxpayer's packing plant used for cooling apples were an integral part of processing because they prevented the apples from dehydrating and shriveling and were otherwise essential to the taxpayer's production of fresh fruit. In *Central Citrus Co. v. Commissioner, supra,* we allowed investment tax credits, holding that taxpayer's "sweet rooms," wherein fruit incurred "degreening" as a result of specific atmospheric conditions involving temperature, humidity, gas, and air-movement control, were an integral part of the taxpayer's production of fresh fruit.

Petitioners offered the testimony of two food experts and respondent offered the testimony of one food expert. Although each expert described a different definition of the term "process," their reports and testimony all indicate that processing brings about a desired change to meet public safety standards or consumer demands. Petitioners' experts predictably state that the freezing of meat and its frozen storage constitute a continuing processing of the meat. They admit that freezing does not enhance the quality of the individual cut of meat but suggest that its value is nevertheless increased. Respondent's expert stated that frozen storage of meat is not a process. He further noted, however, that he considered the initial freezing of meat to constitute a process. He thus concluded that the refrigerated structures in question provided two functions: a freezing as a process function and a freezer storage or warehousing function. A problem respondent's expert encountered was how or where to draw the line between these two functions. The facilities do not have separate rooms for the separate functions; instead, both functions occur in the same area(s), and often simultaneously.

Upon consideration of all the facts, including the extensive testimony by the food experts, we conclude that a "process" did not occur at petitioners' refrigerated structures within the meaning of the relevant statute and

regulations. Although we have found the testimony of respondent's expert to be the most persuasive, we believe that the initial freezing function was secondary and merely a necessary step toward the primary function of the refrigerated structures, i.e., low temperature storage.

The cases relied upon by petitioners are distinguishable in that they represent situations where the food product incurred changes necessary, in those particular circumstances, for providing a desirable or finished product. Such changes included (1) the prevention of dehydration and shrinkage and the removal of ethylene gas in the production of fresh fruit (*Giannini Pack Corp. v. Commissioner, supra*), and (2) the necessary "degreening" of certain fruit (*Central Citrus Co. v. Commissioner, supra*). See also *Brown-Forman Distillers Corp. v. United States*, 205 Ct. Cl. 402, 499 F.2d 1263 (1974), where the maturation of whiskey was determined a process because it aged the whiskey; and *Schuyler Grain Co. v. Commissioner*, 50 T.C. 265 (1968), affd. 411 F.2d 649 (7th Cir. 1969), where the aeration and drying of grain was determined a process because it improved the quality of the grain for its intended use. The freezing and storage of meat in petitioners' refrigerated structures simply did not render a change in the product consistent with the decided cases. We therefore hold that in this case the freezing and cold storage of meat was not a "processing of meat" that qualifies for investment tax credit under section 48(a)(1)(B)(i).[5]

In *Loda Poultry Co. v. Commissioner*, 88 T.C. 816 (1987), filed this date, we also held that the cold storage of meat was not a "processing of meat" that qualifies for investment tax credit regarding certain compartments in the taxpayer's refrigerated structure. Specifically, investment tax credit was denied for a zero-degree compartment and a 28-degree compartment where storage in such compartments was not part of a qualifying activity. The credit was allowed, however, for a 32-degree compartment. Insofar as that particular compartment is concerned, *Loda Poultry* is factually distinguishable from this case. The taxpayer in

---

[5]We note that freezing of meat might be considered a process or part of a process in other circumstances, such as where a taxpayer was seeking a desired texture of the meat facilitating grinding or chopping. Such is not the case here.

*Loda Poultry* was otherwise engaged in processing meat, i.e., chickens were cut, cleaned, inspected, and packaged in a 55-degree compartment of the structure, and then stored, to prevent spoilage, in the 32-degree compartment as the final step in the on-premises processing before the chickens were sold and shipped out. We therefore concluded that the 32-degree compartment was an "integral part of * * * [taxpayer's] production." See sec. 48(a)(1)(B)(i). In this case, petitioner is not otherwise engaged in what may be considered a qualifying activity, for which storage in any of the refrigerated structures might be deemed a necessary final step.

*Bulk Storage of Fungible Commodities—Section 48(a)(1)(B)(iii)*

Petitioners contend that the refrigerated structures were facilities used for the bulk storage of fungible commodities within section 48(a)(1)(B)(iii). That section, however, also requires that such storage be in connection with any of the qualifying activities identified under section 48(a)(1)(B)(i). We have already determined that petitioners' refrigerated structures were not used in a qualifying activity, and the evidence does not otherwise indicate a qualifying activity occurring at petitioners' businesses. Petitioners are therefore precluded from investment tax credits under section 48(a)(1)(B)(iii).

Even if the facilities were used in a qualifying activity, petitioners nevertheless fail to qualify for investment tax credit under section 48(a)(1)(B)(iii). The refrigerated structures were not used for the "bulk storage of fungible commodities." Bulk storage is described in section 1.48-1(d)(5)(ii), Income Tax Regs., as follows:

Bulk storage means the storage of a commodity in a large mass prior to its consumption or utilization. Thus, if a facility is used to store oranges that have been sorted and boxed, it is not used for bulk storage.

Applying the regulation to the facts in this case, the meats and other food products, which were boxed and labeled, were not stored in bulk.

In *Merchants Refrigeration Co. of California v. United States*, 659 F.2d 116 (9th Cir. 1981), investment tax credit

was not allowed where goods stored in the taxpayer's facilities were identified as to individual owner, who segregated the food and retained control over its ultimate disposition. The court held that the goods were not fungible because, among other things, ownership of such goods was not "in common." Petitioners attempt to distinguish this case but fail. The evidence in this case, including photographs, indicates that the meats and other products were containerized, identified, and segregated by owner. The products therefore were not fungible.

## Depreciation Issues

The second issue for consideration is whether the partnerships may use the 200-percent-declining-balance method for computing the allowances for depreciation of the refrigerated structures and truck turn-arounds. The parties agree that our resolution of the investment tax credit issue would also determine this issue. Compare sec. 48(a)(1) with sec. 1245(a)(3). See sec. 1.1245-3(c), Income Tax Regs.

Section 167(b)(2) generally permits taxpayers to use the double-declining-balance method for computing an allowance for depreciation. In the case of "section 1250 property," however, section 167(j)(1) limits the declining-balance method to a rate not exceeding 150 percent. Sec. 167(j)(1)(B). The term "section 1250 property" is defined as "any real property (other than section 1245 property, as defined in section 1245(a)(3))" which is or has been depreciable under section 167. Sec. 1250(c).

The term "section 1245 property" is defined in section 1245(a)(3) as follows:

(3) SECTION 1245 PROPERTY.—For purposes of this section, the term "section 1245 property" means any property which is or has been property of a character subject to the allowance for depreciation provided in section 167 (or subject to the allowance of amortization provided in section 185) and is either—

(A) personal property,

(B) other property (not including a building or its structural components) but only if such other property is tangible and has an adjusted basis in which there are reflected adjustments described in paragraph (2) for a period in which such property (or other property)—

(i) was used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, or

(ii) constituted a research facility used in connection with any of the activities referred to in clause (i), or

(iii) constituted a facility used in connection with any of the activities referred to in clause (i) for the bulk storage of fungible commodities (including commodities in a liquid or gaseous state),

(C) an elevator or an escalator, or

(D) so much of any real property (other than any property described in subparagraph (B)) which has an adjusted basis in which there are reflected adjustments for amortization under section 169, 185, 188, 190, 193, or 194.

Subparagraph (B) of section 1245(a)(3) essentially tracks the language in subparagraph (B) of section 48(a)(1). Because we have already determined that the property in question was not eligible for investment tax credit under section 48(a)(1)(B) and because the property does not otherwise satisfy the definition of "section 1245 property," we conclude that the property is section 1250 property. Accordingly, the 200-percent-declining-balance method is not available for the refrigerated structures and truck turn-arounds. The partnerships must use the 150-percent-declining-balance method.

The third issue for consideration is whether the partnerships may compute the allowances for depreciation of the refrigerated structures and railroad tracks based on useful lives of 15 years, as claimed by petitioners, or 33⅓ years, as determined by respondent. Petitioners bear the burden of proving error in respondent's determination. *Casey v. Commissioner*, 38 T.C. 357, 381 (1962).

Section 1.167(a)-1(b), Income Tax Regs., defines "useful life," in pertinent part, as follows:

(b) *Useful life.* For the purpose of section 167 the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income. This period shall be determined by reference to his experience with similar property taking into account present conditions and probable future developments. Some of the factors to be considered in determining this period are (1) wear and tear and decay or decline from natural causes, (2) the normal progress of the art, economic changes, inventions and current developments within the industry and the taxpayer's trade or business, (3) the climatic and other local conditions peculiar to the taxpayer's trade or business, and (4) the taxpayer's policy as to repairs, renewals, and replacements. Salvage value is not a factor for the purpose of determining useful life. If the taxpayer's experience is inadequate, the

general experience in the industry may be used until such time as the taxpayer's own experience forms an adequate basis for making the determination. * * *

Respondent's engineering experts examined the refrigerated structures and estimated their useful lives, economic and physical, in the range of 35 to 45 years. Respondent argues that a 15-year useful life is not consistent with the 33⅓-year useful life claimed by the partnerships for other structures and building improvements, i.e., docks, mezzanines, and offices, and that petitioners rely solely on the testimony of petitioner Larry Larsen.

The quoted regulation, however, indicates that the best source for determining useful life is the taxpayer's own experience, if any. Petitioner Larry Larsen, unlike respondent's experts, has constructed and maintained refrigerated structures for approximately 25 years. He testified that the structures incur substantial wear and tear, especially the roof and the insulation. He also noted that technological advances render certain of the specialized materials obsolete in a matter of years. Although respondent's experts disagreed with petitioner Larry Larsen, we were nevertheless more persuaded by his testimony. His testimony as to the useful life of such structures was articulate, credible, and more convincing. The useful life of the refrigerated structures is thus 15 years for purposes of computing the allowance for depreciation.

Respondent correctly notes that petitioners offer no evidence regarding the useful life of the railroad tracks; moreover, petitioners' briefs are silent on the issue. Petitioners have thus failed to meet their burden of proof, and respondent's determination as to the useful life of the railroad tracks must be sustained.

*Decisions will be entered under Rule 155.*