CENTRAL CITRUS COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4587–70.   Filed May 24, 1972.

*Leslie T. Jones, Jr.*, for the petitioner.
*Harry Beckhoff*, for the respondent.

STERRETT, *Judge:* The Commissioner determined deficiencies in petitioner's Federal income tax as follows:

| Taxable year | Amount |
| --- | --- |
| June 30, 1966 | $1,108.03 |
| June 30, 1967 | 3,851.91 |

The sole issue for adjudication is whether specific property [1] constructed or installed by petitioner qualifies as "section 38 property" as defined within the provisions of section 48, I.R.C. 1954.[2]

---

[1] The notice of deficiency disallowed the investment credit on the following:
Sweet room construction
Railroad spur
Sweet room doors
Blowers
Coolers
Electrical equipment and lighting fixtures.
Petitioner concedes error in claiming the cost of construction of the railroad spur as qualified investment credit property.

[2] All section references are to the Internal Revenue Code of 1954 unless otherwise indicated.
We note at this juncture that we are herein concerned with the investment credit *prior* to its repeal in the 1969 Tax Reform Act and its subsequent reinstatement in the Revenue Act of 1971.

Petitioner on its September 30, 1968,[3] Federal income tax return claimed an investment credit of $24,069. It applied this amount to its taxable income for that year of $15,799. The remaining credit was carried back to its 1966 and 1967 returns, thereby providing petitioner with a refund of $4,539.17 for 1966 and $3,851.91 for 1967.[4] Respondent thereafter disallowed $4,838.86 of the investment credit claimed in 1968 which produced the above-noted deficiency.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation, together with the exhibits attached thereto, are incorporated herein by this reference.

Central Citrus Co. (hereinafter referred to as petitioner) is an Arizona corporation having its plant and principal office in Tempe, Ariz. It filed U.S. corporate income tax returns on the cash method of accounting for the taxable years ended June 30, 1966, June 30, 1967, and September 30, 1968, with the district director of internal revenue at Phoenix, Ariz.

Petitioner is engaged in the citrus fruit business. It contracts with citrus orchard owners to pick and haul fruit to petitioner's plant where it is processed, cleaned, sorted, packed, and transported to market. Petitioner does not purchase fruit for its own account, but rather handles it on a commission basis for its owner.

In its 1968 fiscal period petitioner constructed a plant 128 feet wide, 326 feet long, with cement block walls 18 feet high. The floor is 4-inch-thick concrete and the roof is made of two arcs which are made of wood. There is no attic throughout most of the plant, and the walls are not insulated.

Petitioner's plant runs east and west. Beginning at a point 56 feet from the eastern end are two large doors through which trucks may be driven. These doors are 14 feet high and 22 feet wide, and are found on either side of the plant. The area from the eastern end to these doors, a distance of 56 feet, differs from the balance of the plant in that processing compartments, commonly referred to as "sweet rooms," have been constructed in this area. The remaining part of the plant is used in conveying, sorting, culling, storing, and packing fruit as well as for petitioner's administrative offices.

The sweet rooms include eight large chambers 55 feet 10 inches long. Six of them are 15 feet wide and two are 12 feet wide. All are 19 feet

---

[3] Petitioner requested and was granted permission to alter its taxable year from July 1 to Oct. 1.

[4] It is unclear to this Court why petitioner received a refund of $3,851.91 for 1967. It seems apparent that with a credit of $24,069 and a tax due in 1968 of $15,799 the carryback totaled $8,270. Applying $4,539.17 to 1966, the remaining credit totals $3,730.83.

8 inches high. The floor is 6-inch-thick concrete. The larger compartments each hold 288 boxes of fruit while the smaller ones can hold up to 216 boxes. Each compartment has a large, insulated, hinged aluminum door. When its door is closed each compartment is closed off from the remainder of the plant from floor to ceiling. The walls of the compartment are made of plywood panels nailed over wooden frames with styrofoam insulation inserted in the space between the panels. The wood is heavily varnished to protect it from the humidity level in the compartments. When portions of the walls are scratched or otherwise damaged the panels are replaced. In the 4 years of operation petitioner has replaced a total of five or six panels.

Between the roof of the plant and the ceiling above each compartment there is an attic area which is divided into eight individual sections to provide a separate attic for each compartment. The attics of the larger compartments contain 65 air jets while the small compartments contain 52. Each compartment's ceiling is flat, insulated, and made of wood. The exterior roof of the plant, above the attics, is also specially insulated.

Each sweet room contains vents which are connected to heating, cooling, gas injection, humidity, and air-moving facilities attached to the eastern wall of the building. These facilities control the temperature, humidity, gas content, and air movement within each compartment. They contain no other machinery or equipment.

The eight chambers are of permanent construction. Though subject to removal, such a process would be difficult as they are anchored by studs into the concrete.

These compartments are essential to petitioner's operation. All fruit, with rare exception, on arrival at petitioner's plant is placed into the sweet rooms. While stored therein the fruit is subjected to controlled external factors including specified temperature, humidity, atmosphere content, so as to govern shrinkage, ripening, color, and the overall quality of the fruit.[5]

The fruit is removed for the most part on completion of treatment. However in certain instances, dependent upon market conditions, removal may occur subsequent to actual completion of processing. In such event petitioner continues to control the atmospheric conditions within the sweet rooms.

The sole function of these rooms is to condition or prepare the stored fruit for packing. Except for possible conversion to cold-storage facilities, they are not reasonably susceptible to any other use, and petitioner contemplates no other use for them.

---

[5] The major portion of fruit arriving at petitioner's plant is in a semiripened state. To ripen properly (commonly referred to as degreening) the fruit is stored in the sweet rooms and subjected to specific atmospheric conditions. Simultaneously other conditions control the fruit's degree of shrinkage, color, etc.

The sweet rooms are depreciable property and have an economic life in excess of 8 years.

The remaining portion of the plant contains the general work area wherein the fruit leaving the sweet rooms, traveling along an automatic conveyor, is cleaned, sized, graded, stamped, and finally packaged. Such process encompasses approximately 15 minutes. Thereafter the fruit is stacked in holding areas ("set back") or placed in cold storage ("precoolers") where it remains until being shipped.

This entire work area is cooled by a series of blowers and coolers, the purpose of which is to reduce the temperature in order to maintain the condition and marketability of the fruit being processed and stored and to provide comfort to petitioner's employees. These blowers and coolers remain on 24 hours each day. They are depreciable property having a useful life of 4 years or more.

Petitioner expended at least $21,791.10 for electrical equipment installed in the citrus plant, claiming an investment credit on the full amount. Respondent disallowed the credit to the extent applicable to $10,091.10, consisting of the following:

| Item | Cost |
| --- | --- |
| 1. Dead front panel | $1,075.00 |
| 2. Transformer | 700.00 |
| 3. Gutter plus ends and cuttings | 19.74 |
| 4. Distribution system adaptors, contractors, fuses, starters, switches, relays | 3,759.61 |
| 5. 10 amp. switch | 23.50 |
| 6. 30 amp. switch | 24.00 |
| 7. Transformer | 165.00 |
| 8. Relay | 8.10 |
| 9. Electric timer | 18.14 |
| 10. Outlets | 615.00 |
| 11. Fluorescent fixtures | 405.78 |
| 12. Spotlight and floodlamps | 59.40 |
| 13. Do. | |
| 14. Moisture-proof lamps | 141.12 |
| 15. Spotlights | 39.06 |
| 16. Transformer | 86.60 |
| 17. Ballast lights | 2,097.92 |
| 18. Outside mercury vapor lights | 1,010.10 |
| Total | [6] 10,248.07 |

Petitioner concedes that items 5, 8, 9, 50 percent of items 10, 11, 12 and 13, 15 and 18 are used for general lighting and therefore do not qualify as "section 38 property."

[6] The notice of deficiency listed the electrical cost disallowed at a total of $10,091.10, while we find that the cost of the individual items purchased totals $10,248.07. The inconsistency apparently results from an error in addition made by petitioner's accountant which was then applied by respondent to the notice of deficiency.

Item 1, the dead-front panel, channels the electrical power into and throughout the plant. Item 2, the transformer, steps down the voltage so that it may be used by the plant facilities. Item 3, gutter plus ends and cuttings, channels power to the automatic processing line. Item 4, the distribution system, controls and powers the processing line. Item 6, switches, are integrally related to the distribution system. Item 7, transformer, is used in the facilities which control the atmospheric conditions within the sweet rooms. Item 10, outlets; located throughout the plant. Item 14, moisture-proof lamps, are located in the sweet rooms; a special type of lamp which resists moisture. Item 16, a transformer used to power an automatic dumper; and integral part of the packing process. Item 17, ballast lights, special intensity lights located over the grading area which aid in picking out poor-quality fruit.

The electrical equipment is depreciable property having a useful life of 4 years or more.

OPINION

In its 1968 fiscal period petitioner constructed a plant for the processing of citrus fruit. Within one-sixth of the plant area it erected processing compartments, commonly referred to as sweet rooms, wherein fruit while stored was subjected to various controlled atmospheric conditions so as to govern its quality prior to packaging. The remaining floorspace contained the plant's general work area. Petitioner also installed, among other things, blowers and coolers, utilized to lower the temperature in the general work area, and various items of electrical equipment and lighting fixtures. The issue presented for adjudication relates to whether the sweet rooms, blowers and coolers, and electrical appliances qualify for the investment credit within the purview of section 38.[7] In order to so qualify such property must conform to the definition of "section 38 property" as provided in section 48, which states in part:

SEC. 48. DEFINITIONS; SPECIAL RULES.

(a) SECTION 38 PROPERTY.—

(1) IN GENERAL.—Except as provided in this subsection, the term "section 38 property" means—

(A) tangible personal property, or

(B) other tangible property (not including a building and its structural components) but only if such property—

(i) is used as an integral part of manufacturing, production, or extraction * * *, or

---

[7] SEC. 38. INVESTMENT IN CERTAIN DEPRECIABLE PROPERTY.

(a) GENERAL RULE.—There shall be allowed, as a credit against the tax imposed by this chapter, the amount determined under subpart B of this part.

(b) REGULATIONS.—The Secretary or his delegate shall prescribe such regulations as may be necessary to carry out the purposes of this section and subpart B.

(ii) constitutes a research or storage facility used in connection with any of the activities referred to in clause (i) or

\*     \*     \*     \*     \*     \*     \*

Such term includes only property with respect to which depreciation \* \* \* is allowable and having a useful life \* \* \* of 4 years or more.

It is evident from the above-quoted language that compliance with the "section 38 property" definition necessitates (1) depreciable property, (2) having an estimated useful life of 4 years or more, and (3) which is either tangible personal property or other tangible property, excluding buildings and their structural components, used as an integral part of manufacture, production, or extraction or is a research or storage facility.[8] The facts noted above clearly indicate that all property in issue is both depreciable and has an estimated useful life of 4 years or more. We therefore need only concern ourselves with the third requirement.

Turning to the first item in issue, the sweet rooms, petitioner asserts that such property should be classified as other tangible property used either as an integral part of manufacture, production, or extraction or as a storage facility. Respondent, on the other hand, contends that these processing chambers are buildings and therefore cannot qualify as "section 38 property."[9]

Before considering petitioner's assertions we must first ascertain whether the processing chambers are in fact buildings. In this regard respondent, in an attempt to define the term "building," has promulgated section 1.48–1(e)(1), Income Tax Regs., which states in part:

(e) *Definition of building and structural components.* (1) Buildings and structural components thereof do not qualify as section 38 property. The term "building" generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof, \* \* \* The term includes, for example, structures such as apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores. \* \* \* Such term does not include (i) a structure which is essentially an item of machinery or equiment, or (ii) an enclosure which is so closely combined with the machinery or equipment which it supports, houses, or serves that it must be replaced, retired, or abandoned contemporaneously with such machinery or equipment, and which is depreciated over the life of such machinery or equipment. Thus, the term "building" does not include such structures as oil and gas storage tanks, grain storage bins, silos, fractionating towers, blast furnaces, coke ovens, brick kilns, and coal tipples.

More recently in Rev. Rul. 66–89, 1966–1 C.B. 8, respondent has again attempted to interpret this most general of terms. It states therein:

(5) *Storage facilities.* If property (other than a building and its structural components) is a storage facility used in farming such as the cultivation of the

---

[8] The statute requires that the research or storage facility be connected to one of the above-noted activities. Respondent recognizes and readily admits the sweet rooms' connection to the manufacture or production of petitioner's citrus fruit.

[9] For an article most relevant to this issue see Richard, "Is IRS taking too narrow a view on what qualifies as a 'structure' for Section 38?" 30 J. Taxation 181 (1969).

soil or the raising of livestock, and if it cannot be reasonably adapted to other uses, it qualifies as "other tangible property" within the meaning of section 48(a)(1) of the Code, regardless of whether it is a temporary or a permanent facility. Typical storage facilities on farms include grain storage bins, corn cribs and silos. These are all to be distinguished from farm buildings which do not qualify as section 38 property, such as barns, stables, poultry houses and warehouses. All of these contain space within which the farmer works and carries on his farming activities and are ineligible for the credit because they fall within the definition of the term "building." A storage facility, as above illustrated, provides the farmer only storage space but not working space.

It is apparent from both of the above-quoted provisions that at least as to the status of a building versus a storage facility a function or use test is considered by the respondent to be the determining factor. That is, the facility may not be reasonably adaptable to other uses and it must provide only storage space, not working space.

Respondent in applying this test to the instant case would have us look to petitioner's plant as a single unit. He asserts that since the major portion of the plant area was utilized as work and office space the entire structure must be excluded from investment credit treatment. In other words it is respondent's position that portions or areas of a structure cannot qualify separately. We cannot agree. It is manifest from both the statute and respondent's own regulations and revenue rulings that a storage facility can qualify for the investment credit. This being the case we can find little distinction between a self-contained storage facility and one situated within a larger plant. We find support for this position in *Robert E. Catron*, 50 T.C. 306 (1968), wherein this Court stated:

Respondent's position is that no structure may qualify as a storage facility if it provides working space. * * * On brief, respondent is apparently somewhat reluctant to argue directly and forcefully the substantive question of whether the refrigerated room, *considered alone*, qualifies as a storage facility. He argues that working space is provided within the facility as a whole, and there can be no allocation of costs within the facility so that the cold-storage room qualifies while the nonrefrigerated two-thirds does not. In short, he urges that portions or areas of a structure may not qualify separately.

We regard this position as primarily procedural or administrative, and not substantive with respect to the definition of "storage facility" as contrasted with that of "building." * * * *We conclude that an allocation is permissible if the refrigerated portion of a structure qualifies substantively as a storage facility.* [Emphasis supplied. 50 T.C. at 313.]

Applying the above-noted function-or-use test to the sweet rooms we conclude that such property qualifies as a storage facility. In support of this conclusion we note that the sweet rooms were specialized structures used only to subject *stored* fruit to various controlled atmospheric conditions. They had no other function. The unusual dimensions of the rooms and the varied extremes of temperature, humidity, and air con-

tent undoubtedly limited the rooms' *reasonable* adaptability. See *Robert E. Catron, supra.*

Respondent contends however that these chambers were not storage rooms but processing chambers and therefore cannot qualify as storage facilities. In other words, respondent's argument is to the effect that a storage facility is only a storage facility provided that whatever is being stored is done so in a passive sense, i.e., nothing else occurs during the storage period. We cannot agree. In *Northville Dock Corp.,* 52 T.C. 68 (1969), affirmed per curiam 427 F. 2d 164 (C.A. 2, 1970), various grades of oil were placed in oil storage tanks. Respondent apparently conceded the existence of storage facilities, contesting only its connection with the manufacture or production of petitioner's product. The Court in holding for petitioner noted that while stored therein the oil was mixed, circulated, subjected to controlled temperature, and agitated.

The same result was reached in *Sherley-Anderson-Rhea Elevator, Inc.* v. *United States,* 315 F. Supp. 1055 (N.D. Tex. 1970), wherein grain while stored was aerated, turned, dried, blended, sprayed, and subjected to controlled temperature to prevent spoilage and govern the overall quality of the product prior to further processing or sale. See also *Schuyler Grain Co.,* 50 T.C. 265 (1968), affd. 411 F. 2d 649 (C.A. 7, 1969); *Robert E. Catron, supra; F. P. Wood & Son of Elizabeth City, Inc.* v. *United States,* 314 F. Supp. 1205 (E.D. N.C. 1970).

We see little difference between the above-cited cases and the present set of facts.

However, even if we were to agree with respondent, such a decision would not cause the disallowance of the investment credit since it is our further conclusion that the property in issue also qualifies as "other tangible property * * * used as an integral part of manufacturing, production * * *." As section 1.48–1(d)(2) and (4) of the Income Tax Regulations states:

For purposes of the credit allowed by section 38, the terms "manufacturing", "production", and "extraction" include the * * * processing, manipulating, refining, or changing the form of an article * * * Thus, section 38 property would include, for example, property used as an integral part of * * * the processing of meat, fish, or other foodstuffs; * * *

* * * * * * * *

(4) * * * Property is used as an integral part of one of the specified activities if it is used directly in the activity and is essential to the completeness of the activity. * * * all properties used * * * in processing raw materials into the taxpayer's final product, would be considered as property used as an integral part of manufacturing.

Clearly, petitioner's sweet rooms conform precisely to the above-quoted regulations; their controlled conditions were absolutely necessary in

governing shrinkage, ripening, color, and the overall quality of the fruit. See *Northville Dock Corp.*, *supra*, wherein the Court stated:

As shown in the findings of fact, tank number 413 was both used in connection with and was also an integral part of blending two different products, No. 2 oil and No. 6 oil, in order to obtain No. 4 oil, a product whose characteristics and uses are different from the other two. We find this activity sufficient to constitute the making of property by "changing the form of an article, or by combining or assembling two or more articles." [52 T.C. at 73.]

See also *Schuyler Grain Co.*, *supra* at 269, fn. 6.

Upon an examination of the entire record we conclude that petitioner's sweet rooms are "section 38 property" thereby qualifying for the investment credit.

The remaining items in issue are petitoner's blowers, coolers, and electrical equipment.

Respondent relying on section 1.48–1(e)(2), Income Tax Regs., which states in part:

Sec. 1.48–1(e)(2). The term "structural components" includes * * * all components (whether in, on, or adjacent to the building) of a central air conditioning or heating system, including motors, compressors, pipes and ducts; * * * electric wiring and lighting fixtures; * * * and other components relating to the operation or maintenance of a building.

asserts that such property is a structural component of the plant and must therefore be excluded from the "section 38 property" definition. Petitioner contends however that such property is necessary to its operation and is an integral part of its manufacture and production and should therefore be considered tangible personal property other than a structural component.

Referring specifically to the blowers and coolers we must again agree with petitioner. Section 1.48–1(e)(2), Income Tax Regs., in addition to the above-quoted language, states:

However, the term "structural components" does not include machinery the sole justification for the installation of which is the fact that such machinery is required to meet temperature or humidity requirements which are essential for the operation of other machinery or the processing of materials or foodstuffs. Machinery may meet the "sole justification" test provided by the preceding sentence even though it incidentally provides for the comfort of employees, or serves, to an insubstantial degree, areas where such temperature or humidity requirements are not essential. For example, an air conditioning and humidification system installed in a textile plant in order to maintain the temperature or humidity within a narrow optimum range which is critical in processing particular types of yarn or cloth is not included within the term "structural components."

The present facts indicate that such property was used to cool the fruit during packaging and prior to shipment. The reduced temperature was necessary to preserve the quality of the fruit. Though it may also have benefited the employees, the motivating factor behind the

installation of the property was to maintain and preserve a high-quality product. Clearly therefore, the blowers and coolers comply precisely with the above-quoted regulations.

In regard to the status of the electrical equipment respondent has further stated his view in Rev. Rul. 66–299, 1966–2 C.B. 16, which reads in part:

The mechanical service systems described above (plumbing, electrical and sprinkler system) are "structural components" since they relate *generally to the operation of the building* as an overall processing operation system. However, special electrical or plumbing connections which are *necessary to and are used directly with a specific item of machinery or equipment,* or between specific items of individual, machinery or equipment, are not structural components of the building, but are essentially *items of machinery or equipment, and qualify as* section 38 property for investment credit purposes. [Emphasis supplied.]

Such language creates a clear distinction between property used in the general overall operation of a building, wherein the credit is disallowed, see *Fort Walton Square, Inc.,* 54 T.C. 653 (1970); *Ponderosa Mouldings, Inc.,* 53 T.C. 92 (1969), and that property which is utilized to aid in the employment of a particular function or particular piece of property. We find this particular dichotomy to be both reasonable and sound and in agreement with congressional intent. See H. Rept. No. 1447, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 516. In this regard we determine that items 1, 2, and 10 as noted in the facts, are electrical equipment used in the general operation of the plant and therefore do not qualify for the investment credit. The remainder of the items, however, serve either specialized functions or specific equipment and thereby qualify as "section 38 property."

*Decision will be entered under Rule 50.*