**L & B CORPORATION, a Nebraska corporation, Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

**Larry A. LARSEN and Betty J. Larsen, Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

**ESTATE OF Howard C. LARSEN, Deceased, Maxine J. Larsen, Executrix and Maxine J. Larsen, Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

No. 87–2387.

United States Court of Appeals, Eighth Circuit.

Submitted June 16, 1988.

Decided Nov. 25, 1988.

---

Paul A. Rauth, Omaha, Neb., for appellant.

Thomas R. Lamons, Dept. of Justice, Washington, D.C., for appellee.

Before HEANEY and MAGILL, Circuit Judges, and LARSON,* Senior District Judge.

HEANEY, Circuit Judge.

L & B Corporation, Larry A. Larsen, Betty Larsen, the estate of Howard Larsen, Maxine J. Larsen, Lance Sterling Larsen and Ashley Larsen, partners in the partnerships of Larsen Realty, Millard Warehouse—Des Moines (Millard–DM), and Millard Warehouse—Denison (Millard–D), appeal a decision of the tax court denying investment tax credits for refrigerated structures and associated paved truck turnaround areas and railroad tracks.

The individual partners claimed investment tax credits in 1979 and 1980 pursuant to U.S. Internal Revenue Code, 26 U.S.C. § 38, for the cost of constructing these facilities. The Commissioner of Internal Revenue originally allowed a credit for the refrigeration equipment used in the structures and the railroad trackage but disallowed a credit for the cost of constructing the structures themselves.[1] The Commissioner also disallowed a credit for the truck turnaround areas which had subsequently been added to the facilities. On appeal, the Tax Court held that the refrigerated structures, the truck turnarounds, or the railroad tracks were not "buildings" within the meaning of the Internal Revenue Code. The Tax Court denied any tax credit, however, as it found that none of the property was used in manufacturing, production or extraction, as required under the Code.[2]

The partners argue on appeal that an investment tax credit should be given for the cost of the refrigerated structures, truck turnarounds and railroad tracks because they are all used in the process of rapidly freezing meat, an act which constitutes the processing of meat within the meaning of the Internal Revenue Code. The Commissioner argues that freezing does not constitute the "processing of meat" because it improves neither the quality nor the marketability of the product. Furthermore, the Commissioner challenges the Tax Court's determination that the structures are not "buildings" within the meaning of the Code and Treasury Regulations.

We reverse the Tax Court's holding that the refrigerated structures are not buildings within the meaning of the Internal Revenue Code. We also reverse the Tax Court's holding that the rapid freezing of meat is not the "processing of meat." We hold that the partners may not claim a tax credit for the structures but may claim a credit for the truck turnaround areas and those railroad tracks used to transport meat to the structures.

## I. FACTUAL BACKGROUND

The partners claimed investment tax credits for the cost of constructing or improving several refrigerated structures located in Omaha, Nebraska; Lincoln, Nebraska; Des Moines, Iowa; and Denison, Iowa. The refrigerated structures are all constructed in a similar manner. They rest on a foundation of poured concrete and concrete block footings. The floors of the structures are 6-inch poured concrete slabs. Beneath the concrete floor is a 6-inch layer of polystyrene insulation, which serves to maintain cold temperatures inside

---

* The HONORABLE EARL R. LARSON, United States Senior District Judge for the District of Minnesota, sitting by designation.

1. The investment tax credit given for the cost of the refrigeration equipment is not an issue on appeal. *See,* Tax Court Opinion, at 16; Appellee's Brief, at 12.

2. The Tax Court's opinion, which includes a detailed statement of the facts of this case, is reported at 88 T.C. 744 (1987) [1987 WL49298].

the structures. Beneath the insulation and extending under the loading dock is a layer of gravel. Clay pipes within the gravel layer serve to remove waste heat from compressors inside the structures, preventing the ground below the floor from freezing, buckling or heaving.

The walls are made of steel and concrete blocks. The roof is made of corrugated steel and is covered with nine inches of insulation. A single-ply membrane roof covers the insulation.

The partners installed storage racks, refrigeration coils and blowers inside the refrigerated structures. The racks are bolted to the concrete floor, and the coils and blowers are attached to the ceiling above the racks. The storage racks are designed to facilitate the circulation of air over and around the meat stored on the racks. The racks are removable, but holes where the bolts entered the concrete floor would have to be plugged. The lighting systems in these facilities are especially adaptable to extremely low temperatures. An elaborate sprinkler system has been designed to prevent water from freezing in the pipes. The refrigeration equipment, including the coils and blowers, could be removed without structural damage.

Local meat packers, such as Swift, Iowa Beef Packers, and Farmland Foods, ship large quantities of fresh meat to these refrigerated structures. The meat, usually boxed or packaged with labels or brand names, is unloaded at the rail and truck docks adjacent to the structures, placed on pallets, and taken into special compartments inside the structures, called blast freezers, to be rapidly frozen. When this process is finished, the meat is stored in the other refrigerated compartments until shipped back to the packers or to third party purchasers by truck or rail. The rail facilities at Millard–D and Millard–DM accommodated the partnership's export business. The railroad tracks at Millard–DM were used for both in-shipments and out-shipments. Those tracks at Millard–D were used almost exclusively for out-shipments.

During 1979 and 1980, the facilities handled as much as 20 million pounds of meat per week. Although the facilities received some pre-frozen meat, an estimated 99% of all meat received went through the blast freezing process.

## II. LEGAL DISCUSSION

The sole issue on appeal is whether, under section 38 and section 48(a)(1)(B) of the Internal Revenue Code,[3] the refrigerated structures, the truck turnarounds and the railroad tracks are "other tangible property," other than buildings, used as an integral part of manufacturing or production.[4]

---

**3.** Section 38, in effect during the pertinent period, provided:

> (a) *General Rule.*—There shall be allowed, as a credit against the tax imposed by this chapter, the amount determined under subpart B of this part.
> (b) *Regulations.*—The Secretary shall prescribe such regulations as may be necessary to carry out the purpose of this section and subpart B.

Internal Revenue Code of 1954, 26 U.S.C. § 38 [as added by Sec. 2(a), Revenue Act of 1962, Pub.L. No. 87–834, 76 Stat. 960].

Section 48, in effect during the pertinent period, provided:

> (a) *Section 38 property.*—
> (1) *In general.*—Except as provided in this subsection, the term "section 38 property" means—
> (A) tangible personal property (other than an air conditioner or heating unit), or
> (B) *other tangible property (not including a building and its structural components) but only if such property*—

(i) *is used as an integral part of manufacturing, production,* or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, * * *.

Internal Revenue Code of 1954, 2 U.S.C. § 48(a)(1)(A)–(B)(i) [as added by Sec. 2(a), Revenue Act of 1962, Pub. L. No. 87–834, 76 Stat. 960] (emphasis added).

**4.** The investment credit provisions of the Internal Revenue Code, effective in 1979 and 1980, allowed a tax credit for investments in certain types of depreciable property. These credits were enacted in 1962 to create tax incentives to purchase new equipment. Congress hoped to improve our competitive position abroad and to stimulate the economy by encouraging the modernization and expanded use of capital equipment and machinery. *Yellow Freight System, Inc. v. United States,* 538 F.2d 790, 794 (8th Cir.1976); *Illinois Cereal Mills, Inc. v. Commissioner,* 789 F.2d 1234, 1236 (7th Cir.), *cert. denied,* 479 U.S. 995, 107 S.Ct. 600, 93 L.Ed.2d 600

The issues before this Court are whether the refrigerated structures constitute buildings and whether any of the property is being used in manufacturing or production.

## A. The Refrigerated Structures

Section 48 of the Internal Revenue Code authorized a tax credit for tangible property, excluding buildings, used in manufacturing industries. Although the Code does not define what constitutes a "building," the Treasury Regulations restate major portions of legislative history and give some indication of what types of structures Congress intended to exclude from the tax credit provision.

Section 1.48–1(e)(1) of the Treasury Regulations defines a building and its structural components as:

> * * * any structure or edifice enclosing a space within its walls, and usually covered by a roof, the purposes of which is, for example, to provide shelter or housing, or to provide working, office, parking, display, or sales space. The term includes, for example, structures such as apartment houses, factory and office buildings, *warehouses,* barns, garages, railway or bus stations, and stores.

26 C.F.R. § 1.48–1(e)(1) (emphasis added).

■ The regulation and the relevant legislative history define a "building" in terms of physical appearance and function. *Yellow Freight System, Inc. v. United States,* 538 F.2d 790, 796 (8th Cir.1976). The test that this Court and others have used to categorize structures is: 1) whether the structures resemble buildings; and 2) whether they function as buildings.

### 1. *Resemblance*

■ The Tax Court held, and this Court concurs, that the structures look like buildings. Tax Court Opinion, at 23. "The structures are permanent structures of substantial dimensions which enclose spaces surrounded by walls and covered by roofs." *Id.*

### 2. *Function*

We disagree, however, with the Tax Court's conclusion with respect to the second question. We believe that the refrigerated structures do function as buildings for several reasons.

First, Congress and the Treasury Regulations specifically list a warehouse as a building. 26 C.F.R. § 1.48–1(e); H.R.Rep. No. 1447, *supra* (1962–3 Cum.Bull. at 516); S.Rep. No. 1881, *supra* (1962–3 Cum.Bull. at 859).

Second, the Tax Court applied an unduly restrictive version of the function test in this case. Following *Munford, Inc. v. Commissioner,* 87 T.C. 463 (1986) [1986 WL 22010] *aff'd* 849 F.2d 1398 (11th Cir.1988),[5] the Tax Court held that the structures in the present case are not "buildings" because they do not primarily provide working space for humans. Tax Court Opinion, at 25. We believe that this holding ignores the full definition in Treas.Reg. § 1.48–1(e)(1), which specifically includes structures that provide shelter, housing, working space, office space, parking, display areas, or sales space within the definition of "buildings." Nothing, either in the Code or in the Regulations, implies that

(1986). The purpose of the investment tax credit was to encourage investment in machinery and equipment. H.R.Rep. No. 1447, 87th Cong., 2d Sess. (1962–3 Cum.Bull. 405, 413). Most tangible personal property qualified for a tax credit under section 48(a)(1)(A). *Id.* Congress also allowed investment credits for improvements to real property in section 48(a)(1)(B) if the real property was used as an integral part manufacturing or production. H.R.Rep. No. 1447, *supra* (1962–3 Cum.Bull. at 413, 415); S.Rep. No. 1881, 87th Cong., 2d Sess. (1962–3 Cum.Bull. at 720, 722), U.S.Code Cong. & Admin.News 1962, p. 3297. Buildings and structural components of buildings were expressly

excluded from this provision. H.R.Rep. No. 1447, *supra* (1962–3 Cum.Bull. at 415); S.Rep. No. 1881, *supra* (1962–3 Cum.Bull. at 722).

**5.** In *Munford,* a taxpayer sought an investment tax credit for refrigerated warehouses in which he stored prepackaged and prefrozen foods. Both the Tax Court and the Eleventh Circuit denied a tax credit because the warehouses did not provide working space for humans which was more than incidental to the main purpose of the structure to store frozen goods. *Munford,* 849 F.2d at 1404.

this space must be primarily occupied by humans to qualify as a building.

Moreover, the Tax Court's test contradicts Congress' instruction that the term "building" be given its commonly accepted meaning. H.R.Rep. No. 1447, *supra* (1962–3 Cum.Bull. at 516); S.Rep. No. 1881, *supra* (1962–3 Cum.Bull. at 859). In *Munford,* the Eleventh Circuit acknowledged that the Tax Court has formulated a narrower definition of "building" than was intended by Congress. That court stated:

> In reviewing this determination, we begin with the premise that "in the investment tax credit context, the term 'building' has become a term of art," notwithstanding Congress' original intent that the term be accorded its commonly accepted meaning.

*Munford,* 849 F.2d at 1403, *citing Munford,* 87 T.C. at 478. Thus, the Tax Court's definition nullifies Congress' intent. We decline to follow *Munford*'s acquiescence in this reading of the Treasury Regulations.[6]

■ We prefer the analysis of *Starr Farms, Inc. v. United States,* 447 F.Supp. 580 (W.D.Ark.1977), in which the District Court of Arkansas refused to follow the Tax Court's narrow description of "building." In *Starr Farms,* the taxpayer claimed an investment credit for construc-

tion of several environmentally controlled chicken coops. The court held that the coops were buildings within the meaning of Treas.Reg. § 1.48–1(e)(i), even though the coops did not primarily provide humans with working space. The district court argued quite persuasively:

> [A] structure will be deemed to function as a building even if the activity which it shelters is performed solely by machine or animal. To hold otherwise would mean that all structures housing only machines would automatically be deemed non-buildings under the functional test.

*Starr Farms,* 447 F.Supp. at 583.

We believe that the functional test in *Starr Farms* is closer to congressional intent and provides a more enduring analytical framework for this question. Thus, a structure functions as a "building" if it provides shelter for significant machine or animal activity or if it provides working space for humans.[7]

Under this broader concept of "function," the refrigerated structures constitute "buildings." Although employee activity is limited to unloading, palletizing, and moving meat from one storage area to another, significant machine activity is conducted inside the structures by the blast freezers. The refrigerated structures pro-

---

6. The Tax Court's departure from the original intent of Congress stems from its interpretation of *Yellow Freight System, Inc. v. United States,* 538 F.2d 790 (8th Cir.1976). In *Yellow Freight,* this Court held that docks and inspection lanes constructed by a freight carrier constituted "buildings" within the meaning of section 48(a)(1)(B). The loading docks and inspection lanes were permanent structures used to expedite freight and to inspect the long-haul vehicles. In a footnote to its discussion of the "function" test, this Court stated:

> We consider the amount of human activity which occurs within the structure an important consideration under § 48(a)(1)(B) since "buildings," according to Treas.Reg. § 1.48–1(e)(1), typically provide work space for such human activity. The quantum of employee activity is, in our opinion, critical in determining whether the function of a given structure is principally, or only incidentally, to provide work space.

*Yellow Freight,* 538 F.2d at 797 n. 11 (citations omitted).

Footnote 11, discussing the amount of human activity carried on, was in response to a case in which the Ninth Circuit held that the nature of human activity was relevant to the definition of "building," but the amount of human activity was not. *See Thirup v. Commissioner,* 508 F.2d 915, 919 (9th Cir.1974), *rev'g,* 59 T.C. 122 (1972) [1972 WL 2565].

Although this footnote may lend some support to the Tax Court's application of the function test, the holding of *Yellow Freight* does not. In *Yellow Freight,* this Court held that the loading docks and inspection lanes constituted "buildings" because the property provided "shelter and work space so that the men and equipment can perform their functions." *Id.* at 796. This Court did not hold that only structures providing working space for humans constitute "buildings."

7. This test does not include highly specialized structures which actually perform the activity. These structures would qualify as exceptions under Treas.Reg. § 1.48–1(c)(1)(i) or (ii). *See,* Section I A 3, *infra.*

vide shelter for the refrigeration equipment and provide working space for the employees so that meat can be rapidly frozen, stored and shipped. Applying the test above, we find that these structures function as "buildings." Our holding is consistent with Congress' intent that the term "building" be given its commonly accepted meaning, with the "function" test used by this Court in *Yellow Freight*, and with the district court's approach in *Starr Farms.*[8]

We also recognize that several courts have applied the narrower function test to determine whether refrigerated structures constitute "buildings." *See Brown–Forman Distillers Corp. v. United States*, 499 F.2d 1263, 1272, 205 Ct.Cl. 402 (1974) (whiskey maturation facilities constitute "storage facilities" and not "buildings"); *Merchants Refrigerating Co. v. Commissioner*, 60 T.C. 856 (1973) [available on WESTLAW, 1973 WL 2607] (a large freezer room used for storing frozen foods was not a building but a storage facility under section 48(a)(1)(B)(ii) as then in effect); and *Central Citrus Company v. Commissioner*, 58 T.C. 365, 371 (1972) [1972 WL 2547] (atmospherically controlled "sweet rooms" used to ripen fruit were not buildings but storage facilities under section 48(a)(1)(B)(ii) as then in effect); *Catron v. Commissioner*, 50 T.C. 306 (1968) [1968 WL 1547] (the refrigerated area of a Quonset-type structure used for the cold storage of apples

qualified for the tax credit as a "storage facility" under section 48(a)(1)(B)(ii) as then in effect).

At the time these cases were decided, however, the Internal Revenue Code allowed a tax credit for all storage facilities used in connection with a qualifying activity. Thus, the distinction drawn between structures merely housing goods or equipment and structures providing working space for humans was used to distinguish storage facilities from buildings. The provision has since been limited to cover only facilities used to store fungible commodities.[9] The Tax Court decided that the structures in this case do not constitute such a storage facility because the meats were not fungible commodities. Tax Court Opinion, at 34. We agree with the Tax Court's assessment and note that because these refrigerated structures do not qualify as a storage facility under section 48(a)(1)(B)(ii), they must be "buildings" within the meaning of section 48(a)(1)(B).

### 3. Exceptions Under Treas.Reg. § 1.48–1(c)(1)(i) and (ii).

Lastly, the partners argued in oral argument that the structures are not buildings because they fall into the exceptions of Treas.Reg. § 1.48–1(e)(1)(i) and (ii).[10] They argued that the warehouse structures served as "giant refrigerators," without

---

**8.** This Court acknowledges that it departs from the narrow definition of "building" used by the Tax Court and several other circuits. *See, e.g., Munford, supra; Brown and Williamson Tobacco Corp. v. United States*, 369 F.Supp. 1283 (W.D.Ky.1973), *aff'd per curiam*, 491 F.2d 1258 (6th Cir.1974) (tobacco drying sheds used solely for storage are not buildings); *Thirup v. Commissioner, supra*, (a greenhouse does not function as a building). The Internal Revenue Service, as well, has been unwilling to follow the limited approach taken by these cases. *See* Rev. Ruling 77–363 (1977–2 Cum.Bull. 10), *modified by* Rev.Ruling 79–343 (1979–2 Cum.Bull. 18) (Internal Revenue Service refuses to follow *Thirup* decision).

**9.** Congress amended section 48(a)(1)(B)(ii) by section 102(a)(2) and 104(a)(1) of the Revenue Act of 1971, Pub.L. No. 92–178, 85 Stat. 497, replacing the term "storage facility" with the

narrower concept of a "facility used * * * for the bulk storage of fungible commodities." 26 U.S.C. § 48(a)(1)(B)(ii).

**10.** Section 1.48–1(e)(1)(i) provides that the term "building" does not include structures which are essentially an item of equipment. Section 1.48–1(e)(1)(ii) excludes any structure:

which houses property used as an integral part of any activity specified in section 48(a)(1)(B)(i) if the use of the structure is so closely related to the use of such property that the structure clearly can be expected to be replaced when the property it initially houses is replaced.

Treas.Reg. § 1.48–1(e)(1)(ii).

The regulation cites to structures such as oil and gas storage tanks, grain storage bins, silos, fractioning towers, blast furnaces, coke ovens and coal tipples as examples. *Id.*

which the refrigeration equipment would be unable to function. The Tax Court acknowledged the parties' arguments on this point but refused to reach the issue in light of its decision that the warehouses did not function as buildings. Tax Court Opinion, at 27, n. 4. Because we reverse this decision, we must address the issue of whether the structures qualify for either exception.

■ Under section 1.48–1(e)(1)(i), a structure warrants a tax credit if it actually functions as a piece of equipment. After reviewing the record, we find that the structures in this case do not perform the function of freezing the meat. Rather, they were designed to withstand the cold temperatures produced by the compressor engines, the refrigeration coils, and the blowers. The insulation helped maintain the conditions in the structure; the structure itself did not create those conditions. Based on these facts, it appears that the structures are sufficiently separate from the equipment that it cannot fairly be said that the structures perform the function.

■ Under section 1.48–1(e)(1)(ii), the appropriate factors to consider are whether the structure is specially designed to meet the demands of the refrigeration equipment, and whether the structure could be economically used for other purposes.

The structures were designed and constructed in such a manner "as to provide for the cold storage of certain meats and other products." Tax Court Opinion, at 6. The walls, floor and ceiling were insulated. Clay pipes had been laid under the cement floor through which hot air was pumped to keep the floors from freezing, buckling or heaving. Special lighting systems and sprinkler systems which would adapt to the extremely cold temperatures had been installed. Thus, the structures appear to have been designed to meet the demands of the blast freezing process.

Expert testimony indicates, however, that these structures are easily converted from blast freezers to either cold storage facilities or conventional dry storage space without any modifications. Engineering Report of Michael A. Gregory, Exh. AR at 11; Exh. AS at 9. An expert for the partners conceded at trial that the freezer structures could be used for dry storage. Doc. 45 at 144, 256. To convert the structures to other uses, one might replace the lighting system and remove the refrigeration equipment, but neither is necessary to convert the structures to conventional warehouses. Id. at 252–53. Even if the storage racks and the refrigeration equipment had to be removed, it could be done without causing any structural damage.[11] Tax Court Opinion, at 12–13. Because these structures could be used for either cold storage or dry storage without any modifications, we find that they do not fit the exception of section 1.48(a)(1)(B)(ii).

### B. Other Property

Although the partners may not claim an investment tax credit for the warehouse structures, they may offset the cost of the truck turnaround areas and railroad trackage if this property qualifies as "other tangible property" used as an integral part of a qualifying activity. Thus, we must address whether the blast freezing of meat constitutes "manufacturing, production, and extraction," and whether the truck turnarounds and railroad tracks are used as an integral part of that activity pursuant to section 48(a)(1)(B)(i).

#### 1. Manufacturing, Production, and Extraction

■ The Tax Court held that no investment tax credit should be allowed for the structures, the truck turnarounds and the railroad trackage because the structures

---

**11.** We understand that these structures have some special features, such as the clay pipes, the lighting system, and the sprinklers, which would not be found in a conventional warehouse. Yet, none of these features appears to impede the use of the freezers as warehouses. The partners' expert witness conceded that the structures were "over designed" to be conventional warehouses, but that they were conducive to dry storage. Doc. 45 at 244–256.

were used primarily for cold storage and the initial freezing function was not necessary for providing a desirable or finished product. Tax Court Opinion, at 31. We disagree.

The Treasury regulations define "production" as follows:

> (2) *Manufacturing, production, and extraction.* For purposes of the credit allowed by section 38, the terms "manufacturing", "production", and "extraction" include the construction, reconstruction, or making of property * * * from new or raw material, by processing, manipulating, refining, or changing the form of an article, or by combining or assembling two or more articles, and include the cultivation of soil, the raising of livestock, and the mining of minerals. Thus, section 38 property would include, for example, property used as an integral part of * * * *the processing of meat,* fish, or other foodstuffs * * *.

Treas.Reg. § 1.48–1(d)(2) (emphasis added).

The Tax Court clearly erred in finding that the property was not used as an integral part of processing meat.[12] First, the Tax Court heard the expert testimony of Dr. Robert E. Rust, Professor in the Department of Animal Science at Iowa State University, who testified in his report that "freezing or chilling to a specific temperature constitutes a process just as would canning or sterilizing." Exhibit AQ, at 1. Dr. R. Paul Singh, Professor of Food Engineering at the University of California–Davis, testified that blast freezing, as conducted in the partnership's warehouses, constituted the processing of meat because the freezing prevented spoilage of the meat. Exhibit 44 at 1. Dr. Daryl Lung, Professor of food science at the University of Wisconsin–Madison, defined food processing as "the application of chemical, microbiological, and engineering principles to food products for the purpose of improving the value of the product to the consumer." Exhibit 45 at 1. It appears quite clear from the statements of these three experts that the freezing of meat is considered by the food science industry as a part of the overall processing scheme.

Other tax cases support the partners' position that the blast freezing of meat constitutes the processing of meat within the meaning of the Treasury Regulations. In *Giannini Packing Corp. v. Commissioner,* 83 T.C. 526, 533–34 (1984) [1984 WL 15615], the Tax Court held that two cooler rooms used to lower the temperature of apples qualified for an investment tax credit because they prevented the apples from dehydrating and shriveling. This process was found necessary to prepare the fruit for shipment. *Id.* at 534. Similarly, in *Central Citrus Co. v. Commissioner,* 58 T.C. 365, 371 (1972), the Tax Court allowed an investment tax credit for "sweet rooms" in which fruit was degreened through the controlling of atmospheric conditions.[13]

The Tax Court attempts to distinguish these cases by stating that in *Giannini* and *Central Citrus,* the atmospheric conditions changed the food product into a desirable or finished product. Tax Court Opinion, at 31. It implied that blast freezing meat did not enhance the meat product in any way. *Id.* The Tax Court, however, neglected to acknowledge that only

---

**12.** This issue involves an analysis of fact and law, as the term "processing of meat" may have one meaning within the food processing industry but another meaning in the Internal Revenue Code. In mixed law-fact questions involving the interpretations of the Internal Revenue Code, the Court will only reverse if the lower court's finding is clearly erroneous. *Merchants Refrigerating Co. v. United States,* 659 F.2d 116, 117 (9th Cir.1981), *cert. denied,* 456 U.S. 973, 102 S.Ct. 2236, 72 L.Ed.2d 846 (1982) (clearly erroneous standard applied to question of what

constitutes a facility used for bulk storage of fungible commodities).

**13.** *See also, Brown–Forman Distillers Corp. v. United States,* 499 F.2d 1263, 1272–73, 205 Ct.Cl. 402 (1974) (maturation of whiskey constitutes a process because it aged whiskey); and *Schuyler Grain Co. v. Commissioner,* 50 T.C. 265, 272 (1968) [1968 WL 1543] *aff'd* 411 F.2d 649 (7th Cir.1969) (aeration and drying of grain is a process because it improves the quality of grain for its intended use).

through freezing or other similar preserving processes can fresh meat products arrive at their final destination in an edible condition. Like the process used in *Giannini,* the process of blast freezing is necessary to prepare the meat for shipment. We believe that the blast freezing rendered a change in the meat which was necessary to providing consumers with an edible product. We see no relevant distinguishing factors between *Giannini* and this case.

Even more disturbing is the apparent conflict between this case and *Loda Poultry Co. v. Commissioner,* 88 T.C. 816 (1987) [1987 WL 49301], in which the Tax Court held that a 32–degree compartment used to store chickens to prevent spoilage before the meat was sold and shipped qualified for an investment tax credit because it was used as an integral part of a chicken processing business. The only distinction between the storage of meat in the *Loda* case and in the present case is that the chicken had been cut, cleaned, inspected, packaged, and then stored on the same premises. This distinction hardly warrants the legal significance attributed to it by the Tax Court. Thus, blast freezing constitutes the processing of meat and the Tax Court clearly erred in determining otherwise.

#### 2. *Integral Part of Production*

In order for property to qualify for the investment tax credit, it must be used as an integral part of production. Treas. Reg. § 1.48–1(d)(4) includes property which is:

> used directly in the activity and is essential to the completeness of the activity. * * * [A]ll properties used by the taxpayer in acquiring or transporting raw materials or supplies to the point where the actual processing commences (such as docks, railroad tracks, and bridges), or in processing raw materials into the taxpayer's final product, would be considered as property used as an integral part of manufacturing. Specific examples of property which normally would be used * * * are * * * railroad tracks and signals * * *.

Treas.Reg. § 1.48–1(d)(4).

The Commissioner concedes that the truck turnarounds and the railroad tracks at the Millard–DM warehouse qualify for the investment tax credit if used as an integral part of the processing of meat. Appellee's Brief, at 23 n. 16. As the turnarounds and railroad tracks were used in transporting fresh meat into the refrigerated structures, they constitute property "used directly in the activity" of blast freezing meat.

### III. CONCLUSION

We reverse the Tax Court and hold that the refrigerated structures in this case function as builldings because they are non-specialized structures which provide shelter for significant machine and human activity. We also hold that the blast freezing conducted in the refrigerated structures constitutes the processing of meat. Thus, all of the truck turnarounds and the railroad tracks at Millard–DM qualify for an investment tax credit.

Because the truck turnarounds qualify as other tangible property under section 1.48–1(d) of the Treasury Regulations and Section 48(a)(1)(B)(i) of the Code, they also qualify as "other property" under section 1245(a)(3)(B)(i) of the Code and may be depreciated under the 200% declining balance method of depreciation under section 167(b)(2).