T.C. Summary Opinion 2011-132

UNITED STATES TAX COURT

ROBERT L. WILLSON, SR., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 11164-04S.                    Filed November 23, 2011.

Robert L. Willson, Sr., pro se.

Jessica R. Nolen, for respondent.

HOLMES, Judge:  Robert Willson opened a bar in 1986, and it
gave him nothing but trouble.  He's seen lawsuits, endless
repairs, and even a catastrophic fire.  One might say the City of
Des Moines did him a favor when it finally condemned the land in
2000 to expand its airport--right around the time Willson began
serving a federal prison term.  But the Commissioner wouldn't let
things be and says that the condemnation triggered a large

capital gain that Willson didn't correctly report.[1]  This meant the bar would give him one more headache--because, though Willson represented himself at trial, the facts as he described them would be worthy of an advanced exam problem in tax accounting.

## Background

Willson never planned to own a bar.  He would much rather have kept fixing cars at the repair shop he'd owned since at least the early 1980s--but that work became impossible after a burglar shot him in the arm.  Looking for a new career, he used his savings to lease, and then buy, land next to the Des Moines International Airport.  On the land there were already some buildings.  The largest was an inverted L-shaped structure called Fast Jacks (referred to as a "rock" bar because it featured "rock-and-roll" music and dancing).  Nestled inside the "L" was a beer garden, and to the north--abutting the highway--a smaller building that had been used as a house and then a pizza kitchen. Willson reopened the place in 1986 and renamed it City Limits. He bought out his landlord and became owner on July 1, 1986.

Willson soon learned that the bar's limited parking forced clients to park on the street, and pass around a small pond.

---

[1] The case was tried under Internal Revenue Code section 7463.  (All section citations are to the Code as in effect for 2000 unless otherwise noted, and all Rule references are to the Tax Court Rules of Practice and Procedure.)  Because Willson chose small-case status, this decision is not reviewable by any other court, and this opinion should not be cited as precedent.

Because departing patrons weren't the best swimmers or jaywalkers, Willson decided he'd better do something about it.

The first thing he did was fill the pond with dirt and rocks. Then he graded the land, expanded parking, and spent $3,000 to put in parking-lot lights. He also spent $10,000 to put in a new sewer system. By 1987 he had two gravel parking lots which had cost him a total of $10,000, and a paved one on which he spent $19,000. He remodeled the bar's interior for $25,000 and built a large shed for $15,000. Business took off, and Willson decided to rent his bar out so that someone else could operate it for awhile.

All was well for a time, but then his tenants stopped paying rent. Willson went over to see what was wrong. More than he imagined--a series of unfortunate events had culminated in the collapse of the roof. He again fixed the place up and unsuccessfully tried to sell it. There were no takers, and Willson moved on to his backup plan. He finished building an outdoor concert stage that his lessees had started (they laid the concrete) and added another stage in the beer garden. He even paid $10,000 to put large windows in a wall so that patrons could see indoor performances from outside.

With these new stages, the bar became a local mecca for a type of "rock and roll" called "glam metal." While the Court took no expert testimony on the nature of such groups, it did

allow into the record Willson's own explanation of this genre of musical entertainment.  We also took judicial notice that "hair bands" had lost much of their popularity with the coming of something called "grunge rock" (another type of "rock and roll" music) in the early nineties.  This was important to Willson's business because "hair bands," with such unlikely names as Head East, Great White, and Saturn Cats could still draw large crowds to a bar on the outskirts of Des Moines but had become affordable providers of live entertainment.  Willson even invited one of these "hair bands" to be a sort of artist-in-residence.

One night in 1994, a few band members did something to a smoke machine that sparked an enormous fire.  This fire engulfed everything except the parking lots, the shed, and the property's original house.[2]  It also forced Willson to make a choice--sell to the City as part of its airport expansion, or rebuild.  Willson was unable to sell, so he had to rebuild.  He rented out the old house to a tenant who installed minor improvements (e.g., poles) and opened an establishment felicitously--and paronomastically--called the "Landing Strip," in which young lady ecdysiasts engaged in the deciduous calisthenics of perhaps unwitting First Amendment expression.  See City of Erie v. Pap's A.M., 529 U.S. 277, 289 (2000); Evans v. Commissioner, T.C. Memo.

_____

[2] Willson was using the old house as temporary housing for some of the bands.

2010-62. He also used $169,000 of his $200,000 insurance proceeds to rebuild the bar.[3]

Des Moines began moving to condemn the bar and the land sometime in 1999. Willson closed the bar doors by May 5, when he transferred the property to his lawyer for safekeeping until the matter with the City was resolved. His criminal troubles-- something to do with money and drugs and possibly the bar--were reaching the point where Willson was about to begin serving a federal prison term, and he authorized his lawyer to act for him in dealing with the City while he was imprisoned.

The City did finally condemn the property--perhaps to the relief of Willson's neighbors--by January 25, 2000. (The date is a bit fuzzy, because witnesses' memories had become hazy; but the local property records show the City of Des Moines owned the property by that date.) The City placed the condemnation award in a trust account, and the trust made a distribution--most of which satisfied outstanding loans tied to the property.

Despite his legal problems, however, Willson did manage to file his 2000 tax return. The Commissioner determined that he had underreported his income. Willson timely filed a petition to contest the Commissioner's determination, but trial was postponed for several years while he served out his sentence. After his release, Willson moved back to Iowa (where he resided when he

_____

[3] He spent $144,000 on materials and $25,000 on labor.

filed his petition), and we tried the case in Des Moines. The
one remaining issue is Willson's adjusted basis in the property
at the time of the condemnation.[4]

### Discussion

We begin by stressing that Willson chose "S case" status.
Rule 174(b) allows a taxpayer like Willson to introduce evidence
in an S case that would otherwise not be admissible, and it lets
us conduct the trial as informally as possible (consistent with
orderly procedure) and to admit any evidence we decide has
"probative value"--a fancy way of saying any evidence that helps
or hurts Willson's case. This looser rule is important here,
because Willson presented his case quite credibly through his own
testimony and that of others who worked at the bar or lived
nearby during its heyday. Despite the raffish pasts of Willson
and some of his witnesses, we found their testimony on his
investment in the bar entirely credible.

Willson did his best to explain in as plain a way as
possible the history of the property and what he spent on it. We
will try to return the favor by minimizing taxspeak. Explaining
our decision, however, does require some tax vocabulary: Someone

---

[4] Willson also claimed more real-estate taxes on his return
than allowed in the notice of deficiency. The Commissioner
conceded an additional $22,519 in taxes before trial, which left
$10,291 in dispute. Because Willson provided no evidence at
trial of any taxes paid beyond the $22,519, we sustain the
Commissioner on this issue. See Rule 142(a)(1).

who sells property is taxed on the gain, not the sale price. This gain basically depends on two other numbers: the amount the seller receives and what is called "adjusted basis." Sec. 1001(a). Both these numbers can be complicated to figure out. The amount the seller receives is not just how much cash he pockets. It also includes, for example, money that goes to pay off other debts tied to the property. Sec. 1.1001-2(a), Income Tax Regs. The Commissioner stated in his pretrial memorandum that the amount that Willson received in this sense (called the "amount realized") is $203,427. Willson doesn't dispute this.[5]

That leaves us with the "adjusted basis." To figure out Willson's gain, we have to subtract the adjusted basis from the amount realized. Basis is pretty much what a property owner paid for the property plus what he later spent to improve it. Secs. 1011, 1012, 1016. A taxpayer can't generally deduct these payments right away because they provide a benefit that lasts longer than just one taxable year.[6]

But before calculating the capital gain the basis must be *adjusted* under section 1016. And depreciation is one of those adjustments we need to figure out in this case. See sec. 1016(a)(2). Most property doesn't just fall apart one day, it

---

[5] In his pretrial memorandum and at trial the Commissioner referred to this as Willson's "economic benefit."

[6] For example, when Willson built a shed on his property, he didn't plan to rebuild it every year.

suffers wear and tear over time. That's why the Code allows a taxpayer yearly deductions for depreciation over the estimated useful life or recovery period of the property used in a trade or business.[7] See secs. 167 and 168. Once property is no longer used in a trade or business, a taxpayer can't take depreciation deductions even if he still owns it. See sec. 167(a)(1).

The trial showed that Willson and the Commissioner disagree about how much Willson spent on the property over the years, and how much the allowable depreciation reduced that amount.

I. Amount Spent

In the notice of deficiency, the Commissioner said Willson spent $170,000 for the property--$160,000 for the real estate and $10,000 for a liquor-distribution system that the previous owner had installed. Willson doesn't dispute that he paid $10,000 for equipment, but he remembers paying more for the real estate. We don't find his testimony credible on this particular point--the property assessments for later years led us to conclude that his estimate is a bit high.

The Commissioner, however, doesn't divide the $160,000 cost of the real estate between the land and the buildings. This is a

---

[7] Let's say it costs a taxpayer $10,000 to construct a building that will last ten years. He can't deduct $10,000 from his taxes when he builds it. Nor does he have to wait ten years to take the deduction. Instead, he might get to deduct $1,000 from his taxes in each of the ten years that he's using the building. (Actual depreciation is much more complex than in this example.)

critical mistake.  Because land is not subject to the same wear and tear as buildings, depreciation isn't allowed for the land. Willson did give us the 1994 real-estate assessment, and based on its land-to-buildings ratio, we find that $29,000 is allocable to the land (the nondepreciable asset) and $131,000 is allocable to the buildings.

Willson also gets basis for any improvements he made to the property after he bought it.  Willson filled in the pond, graded the land, and put in parking lots with lights for $37,000.[8]  He added a sewer system for $10,000 and a big shed for $15,000.  He also spent $25,000 in modifications to the interior of the rock bar and $10,000 to replace a wall with windows.  These expenses are depreciable.  Once we add them to his original cost, Willson had the following basis in the property before taking into account any depreciation:

---

[8] We find that the cost of filling in the pond and grading the land was directly related to, and a necessary part of, the parking lots' construction, and not inextricably associated with the land itself.  Because we find that the parking lots were depreciable property necessary to the operation of Willson's business, we add the cost of filling in the pond and grading the land to the parking lots' bases.  See, e.g., Trailmont Park, Inc. v. Commissioner, T.C. Memo. 1971-212.

| Item | Basis |
|---|---|
| Land | $29,000 |
| Shed | 15,000 |
| Equipment (liquor distribution) | 10,000 |
| Parking lots | 37,000 |
| Sewer system | 10,000 |
| Buildings | 166,000 |
| Total | 267,000 |

II. Depreciation

Section 167 gives us the general rules governing depreciation deductions.  In 1981 Congress added section 168, entitled "Accelerated Cost Recovery System" (ACRS), which simplified the rules and allowed taxpayers to take greater depreciation deductions over fewer years.  Economic Recovery Tax Act of 1981 (ERTA), Pub. L. 97-34, secs. 201(a), 209(a), 95 Stat. 203, 226.  ACRS was then replaced by the modified accelerated cost recovery system (MACRS) in 1986.  See Tax Reform Act of 1986 (TRA 86), Pub. L. 99-514, secs. 201, 203, 100 Stat. 2122, 2143.  We still, however, apply ACRS to depreciable property like Willson's property that was placed in service from 1981 through 1986.  This is because MACRS applies only to property placed in service after 1986.  Id. sec. 203(a), 100 Stat. 2143.

- 11 -

A.   Shed

Willson built a large storage shed in 1987 that was unaffected by the 1994 fire.  Because he couldn't remember the month in which it was built, we depreciate his shed from January 15, 1987,[9] to May 15, 1999.[10]  We also find MACRS applies because the shed was built after 1986.

Our analysis doesn't stop there.  We must determine what kind of property the shed was.  This is because depreciation under MACRS depends on how the Code and the IRS classify each particular bit of property.  Based on the trial testimony, we think that the shed was a large metal building like those found on farms--it was big enough to store tractors and other heavy equipment and even had windows.  Willson had also put down a

_____

[9] We weren't able to determine precisely when Willson put some of his property in service.  After so many years, he understandably could remember only the year and not the particular day or month.  When this happens, we make an assumption in favor of the Commissioner (because Willson had the burden of proof) and use the earliest possible date during the year.  See Langer v. Commissioner, T.C. Memo. 2008-255, affd. 378 Fed. Appx. 598 (8th Cir. 2010); Williams v. Commissioner, T.C. Memo. 1987-308.

[10] ACRS and MACRS tell us to apply the midmonth convention to the nonresidential real property.  See sec. 168(b)(2) (as in effect before the Tax Reform Act of 1986 (TRA 86), Pub. L. 99-514, 100 Stat. 2085); sec. 168(d)(2) (as in effect after TRA 86).  The midmonth convention treats "property placed in service during any month (or disposed of during any month) as placed in service (or disposed of) on the mid-point of such month."  Sec. 168(d)(4)(B).  Although Willson closed the doors to the bar on May 5, 1999, the midmonth convention says we don't stop depreciation until May 15, 1999.

concrete slab as a foundation.  We therefore find that the shed

is "nonresidential real estate," see <u>L & B Corp. v. Commissioner</u>,

862 F.2d 667, 671-73 (8th Cir. 1988), revg. 88 T.C. 744 (1987),

and under MACRS is depreciable using a straight-line method over

31.5 years.[11]

B.   <u>Equipment</u>

The 1994 fire destroyed the liquor-distribution system.

Willson never replaced it, so section 1033 doesn't apply.  This

means that, while Willson's 1994 taxes may have been affected by

this property, see sec. 1.1033(a)-2(c)(2), Income Tax Regs., it

doesn't affect our determination of Willson's capital gain in

this case--we don't add its cost to his basis, nor do we have to

calculate its depreciation.

C.   <u>Parking Lots and Sewage System</u>

We hold that the construction in 1987 of Willson's parking

lots--including the filling of the pond, the grading, and the

installation of lights--and sewage system are "land

improvements."  See Rev. Proc. 87-56, 1987-2 C.B. 674.  As such,

they are depreciable as 15-year MACRS property beginning July 1,

---

[11] Under MACRS we apply a 31.5-year recovery period if the nonresidential real property was placed in service before May 13, 1993, and a 39-year recovery period if placed in service after May 12, 1993.  See Omnibus Budget Reconciliation Act of 1993, Pub. L. 103-66, sec. 13151, 107 Stat. 448.

1987,[12] using a 150-percent declining-balance method first, and then a straight-line method in the first year it allows for a greater depreciation deduction.  Sec. 168(b) (as in effect after TRA 86).

D.   Building

That leaves us with the most complex asset to deal with--the main building.  It is true that the right to deduct depreciation doesn't necessarily require property ownership; but the Code requires the taxpayer to have made a capital investment in the property he wants to depreciate.  See Gladding Dry Goods Co. v. Commissioner, 2 B.T.A. 336, 338 (1925).  We find that Willson's capital investment was made on July 1, 1986, when he bought the property.  Therefore we have to calculate the depreciation from July 15, 1986, to May 15, 1999.[13]

Because the building was placed in service in 1986, we start with ACRS.  The building was nonresidential real estate, and ACRS says to depreciate it over 19 years.  Sec. 168(c)(2)(D) (as in effect before TRA 1986).  The 1994 fire, however, makes the depreciation calculation more complicated because it destroyed roughly two-thirds of the building.

---

[12] We must apply a half-year convention.  See sec. 168(d)(1) (as in effect after TRA 86).  This convention is a rule that treats any property that a taxpayer begins or stops using in his business during the year as having begun or stopped being used on the midpoint of the year.  See sec. 168(d)(4)(A).

[13] Again we have to use a midmonth convention.

Computing the depreciation for the one-third of the building that was unscorched is easy.  We attribute $55,000 of the building's basis--about one-third of it--to this portion of the property and find that it should be depreciated as 19-year ACRS property from July 15, 1986, to May 15, 1999.[14]  Willson used this part of the building for his business before, during, and after the fire.  As for the remaining two-thirds, to which we allocate $111,000 of the building's basis, we find that it was depreciable as 19-year ACRS property from July 15, 1986, until July 15, 1994.

We now must consider another section of the Code.  Section 1033 says that Willson doesn't have to recognize gain on the receipt of insurance proceeds when property is "involuntarily converted" in whole or in part, by fire or flood or other acts of God, when the amount realized is reinvested in suitable replacement property.[15]  Sec. 1033(a)(2).  Without section 1033, Willson's receipt of the insurance proceeds in 1994 would have been taxed as a partial sale of the destroyed portion of the

---

[14] The depreciation for 19-year ACRS property is determined using a 175-percent declining-balance method, and then a straight-line method when it allows for a bigger deduction.  Sec. 168(b)(2)(A)(ii) (as in effect before TRA 86).

[15] Section 1.1033(a)-2(c)(2), Income Tax Regs., says that an owner of property is deemed to have chosen section 1033's nonrecognition treatment if he fails to report the gain realized on the involuntary conversion on his return for the first year in which gain is realized.  There's no evidence suggesting Willson reported any gain on his 1994 return.

building.  Section 1033, however, lets Willson delay paying tax on the gain realized as long as he takes the money and reinvests all of it in similar property within a couple of years.  This is because the replacement property generally has the same basis as the converted property, and the gain will eventually be recognized when the replacement property is sold.

But Willson's receipt of "boot"--a bit of tax jargon that in this case means the money the insurance company paid him but that he didn't reinvest in "eligible replacement property"--should have caused him to pay taxes on some of the gain in 1994 (but no greater than the amount of boot he received).  There is, however, no evidence in the record showing that was what he did.  (There is evidence that he gave the "boot" to the band that caused the fire, out of sympathy for the uninsured loss of their equipment.)

So how does all this affect our determination of Willson's adjusted basis?  Out of the $200,000 Willson received from the insurance company, we find that $190,000 was to compensate for the building damage and $10,000 was to replace some of his personal property consumed by the fire.  Willson used $169,000 of the insurance proceeds to rebuild his bar, which we find was completed by January 15, 1995.  This means that Willson's basis in the reconstructed part of the building (as of January 15, 1995) was the same as his basis in the destroyed portion immediately before the fire, minus $21,000 (the amount of the

insurance proceeds given to repair his building that wasn't reinvested in the property and wasn't recognized).[16]

Now we need to figure out how to depreciate the remaining two-thirds of the building from January 15, 1995, to May 15, 1999. Should Willson have continued depreciating the reconstructed portion of the building under ACRS or should he have switched to MACRS?

Taxpayers generally have to depreciate property that they place in service after December 31, 1986, under MACRS. But this rule has its exceptions. For example, Congress enacted "antichurning" rules, which preclude the application of MACRS to property placed in service after 1986 that was essentially owned or used by the taxpayer before 1986--before MACRS applied. See sec. 168(f)(5) (as in effect after TRA 86). One antichurning rule says that section 1250 property acquired by the taxpayer after December 31, 1986, does not qualify for MACRS if it was acquired in an exchange described in section 1031, 1033, 1038, or 1039. Section 168(f)(5)(B)(i), however, says that this rule doesn't apply to nonresidential real estate (e.g., Willson's building). Therefore the Code suggests that we apply MACRS from January 15, 1995, to May 15, 1999.

---

[16] We can't give him a higher basis under section 1033(b)(1)(B) for the gain he should have recognized in 1994, but didn't.

We must account, however, for the eight years Willson's converted property was depreciable under ACRS in determining the bulding's remaining recovery period as of January 15, 1995. We therefore subtract 8 years from MACRS's 39-year recovery period, which leaves 31 years.[17] This means that as of January 15, 1995, the rebuilt portion of the building was depreciable over a 31-year remaining recovery period, using a straight-line method.

To summarize, the formula for figuring out Willson's gain:

| | |
|---|---|
| Amount realized | $203,427 |
| Land | (29,000) |
| Shed | (15,000) |
| Parking lots | (37,000) |
| Buildings | (166,000) |
| Sewer system | (10,000) |

+ MACRS depreciation of shed
+ MACRS depreciation of parking lots
+ MACRS depreciation of sewer system
+ ACRS & MACRS depreciation of main building
+ $21,000 of section 1033 unrecognized gain

Since there are computations that still need to be made and plugged into this formula,

<u>Decision will be entered under Rule 155</u>.

---

[17] See sec. 1.168(i)-6(c)(4)(i), Income Tax Regs. (effective Feb. 26, 2007). Although this regulation doesn't apply to this case, we find it persuasive as to how to account for the prior ACRS depreciation given the lack of guidance on the issue.